Latrobe Municipal Authority, Appellant *v.*
Youngstown Borough Municipal Authority, Appellee.

Argued October 4, 1982, before Judges ROGERS,
BLATT and CRAIG, sitting as a panel of three.

*George M. Lynch,* for appellant.

*Joseph Friedman,* with him *James H. Webster, Springer & Perry,* for appellee.

OPINION BY JUDGE ROGERS, February 15, 1983:

The Youngstown Borough Municipal Authority (Youngstown) instituted a suit in equity against Latrobe Municipal Authority (Latrobe) seeking specific performance of a written contract dated 1959 for the supply of water by Latrobe to Youngstown for resale by Youngstown to its 600 customers. The occasion for the contract was Youngtown's need of, and request for, water from Latrobe because part of Youngstown's supply was subject to pollution.

From the inception of service by Latrobe to Youngstown, the latter's use of water was measured by meter at the point of delivery. The rates charged Youngstown were the same rates as that charged Latrobe's other customers whose consumption was measured by single meters installed at the points of delivery. These classes were Schedule C — Latrobe Division; Schedule E — Bradenville Division; Schedule ML (for multiple occupancy, two or more units on one meter) — Latrobe Division; and Schedule MB (also multiple occupancy) — Bradenville Division. The charges effective September, 1977 were $.63 per thousand gallons for the first 50,000 gallons used per month, $.38 per thousand gallons for the second 50,000 gallons, and so on, in descending price scale, the minimum charge being $.21 per thousand gallons consumed for all over 1,000,000 gallons per month. Youngstown seems to have been considered to be in

the Schedule C—Latrobe Division described as a class including all domestic, commercial and industrial uses of water.

During the first five years or so after the 1959 agreement went into effect, Youngstown's demands on Latrobe's supply were low; but then it increased until lately Youngstown has been taking as much as 7,000,000 gallons a month. Under the rates just described, Youngstown was charged only $.21 per thousand gallons for 6,000,000 of the gallons it consumes; and at this price was able to charge its residential customers lower rates than Latrobe charged its own direct meter residential customers. This circumstance, together with the receipt of an inquiry by another municipality considering the purchase of water, caused Latrobe to make a study of the rates charged Youngstown and in the spring of 1979 Latrobe concluded that Youngstown should be placed in a new classification to be called Schedule R-Resale and be charged the flat rate of $.50, later reduced to $.45, per thousand gallons for all water supplied. Coincident with the change in Youngstown's status, Latrobe increased its rates to its other metered customers by about twenty percent across the board. The effect of its reclassification and the new rate on Youngstown was to require it to pay about $3,500 a month for the 7,000,000 gallons it obtained from Latrobe, instead of about $1,800 a month which it would have been charged under the 1979 rates had it continued to be charged as a Schedule C—Latrobe Division customer.

Youngstown refused to pay the new rates; Latrobe threatened to refuse delivery; and this litigation was commenced by Youngstown's complaint in equity seeking principally an order requiring Latrobe to perform the 1959 contract as it, Youngstown, interpreted it; that is as requiring Latrobe to supply water to

Youngstown at the same rate charged its other metered customers and this in perpetuity.

The hearing judge decided that the 1959 contract contained what he termed a latent ambiguity[1] and admitted the testimony of the lawyer who represented Youngstown when the 1959 contract was negotiated and of Youngstown's present engineer who in 1959 was engaged as an engineering consultant to both Youngstown and Latrobe. This testimony was to the effect that the parties' understanding when the agreement was made was as Youngstown contended — that Latrobe would be obliged to supply water to Youngstown at the same rate it charged its other metered customers. The hearing judge held that the contract meant what the witnesses said it did and enjoined Latrobe from charging Youngstown "a greater rate than it charges its other customers;" enjoined Latrobe from placing Youngstown in the new R-Resale classification; ordered Latrobe to place Youngstown in the Schedule C — Latrobe Division classification; and gave judgment in favor of Youngstown and against Latrobe for $4040 for engineering services rendered to Youngstown in the litigation.

We have examined the 1959 contract in the light of the circumstances which attended it, and conclude

---

[1] There clearly was no latent ambiguity here. A latent ambiguity is, as Chief Justice SHARSWOOD wrote, quoting Lord Bacon, "that which seemeth certain and without ambiguity, for anything that appeareth upon the deed or the instrument, but there is some collateral matter out of the deed that breedeth the ambiguity." *Lycoming Mutual Insurance Co. v. Sailer*, 67 Pa. 108, 112 (1870). The facts of the case just cited presented a perfect example of latent ambiguity involving a policy to insure the "hay house in the meadow." The words were clear but there happened to be two buildings in the insured's meadow in which hay was kept. The hearing judge in the instant case concluded, we believe erroneously, that the language of the contract was ambiguous. An ambiguity appearing on the instrument is a patent, not latent, ambiguity.

that the contract is not ambiguous but clear on its face; and that properly interpreted it imposes no restraint on Latrobe's power conferred on it by Section 4B(h) of the Municipality Authorities Act of 1945,[2] 53 P.S. §306(B)(h) to "fix, alter, charge and collect rates ... at reasonable and uniform rates to be determined exclusively by it" and in so doing reasonably to classify and reclassify its customers. *Glenn Riddle Park Inc. v. Middletown Township and Middletown Sewer Authority*, 11 Pa. Commonwealth Ct. 574, 314 A.2d 524 (1974); *Greenville Borough v. Guerrini*, 208 Pa. Superior Ct. 42, 220 A.2d 366 (1966). It follows that we conclude that it was error to admit into evidence, and interpret the contract on the basis of, parol evidence, and finally that the decree appealed from must be reversed.

The pertinent provisions of the 1959 contract are:

FIFTH: As part of the consideration for this agreement, *Youngstown agrees to purchase annually from Latrobe water at Latrobe's then existing rates* in an amount which shall provide a minimum annual revenue to Latrobe of the sum of Two Thousand Five Hundred ($2,500-.00) Dollars for the next succeeding thirty (30) years following the execution of this agreement. Youngstown will pay to Latrobe the minimum sum of Six Hundred Twenty Five ($625.00) Dollars quarterly to be applied to Youngstown's monthly purchase of water until the annual sum of Two thousand Five Hundred ($2,500-.00) Dollars has been paid. Any water which Youngstown has paid for, but not used, will be applied to the succeeding water bills of Youngstown, but this shall not carry over from year to year, and any unused portion at the

---

[2] Act of May 2, 1945, P.L. 382, *as amended.*

end of each calendar year shall be considered as the minimum due under this contract. The calendar year shall be the basis for the billing under this agreement.[3]

SIXTH: *Latrobe agrees to supply Youngstown with water at its rates established at the time of the delivery of the said water,* but Latrobe does not guarantee to Youngstown or its customers that the water supplied by Latrobe shall be sufficient for fire protection for Youngstown and its customers, and Latrobe is not to be considered as an insurer of property or persons who are customers of Youngstown. Latrobe will use reasonable care and diligence to prevent and avoid interruption and fluctuations in its service to Youngstown, as such care and diligence is reasonable for persons operating comparable water systems in a similar area, but Latrobe does not guarantee that interruptions and fluctuations in its service to Youngstown will not occur because of breaks, defects, leaks or repairs necessary to its facilities, or those caused by strike, acts of God and other causes beyond the control of Latrobe. In the curtailment of service for any reason, it shall be done in a reasonable manner and under the control and discretion of the Manager of Latrobe. *Latrobe will not operate its service to Youngstown in such manner as to place Youngstown or its customers in an unreasonable disadvantage to the customers of Latrobe.* (Emphasis supplied.)

---

[3] The $2500 floor placed under Youngstown's charges during the first thirty years of the contract was to reimburse Latrobe for the debt, interest and other charges, on account of the inclusion by Latrobe of the sum of $25,000 in a bond issue, used to construct the connection between its and Youngstown's systems.

The principles applicable in this class of case are economically stated by Chief Justice ROBERTS in *R. F. Felte, Inc. v. White*, 451 Pa. 137, 143-144, 302 A.2d 347, 351 (1973):

When interpreting a contract the intention of the parties must be determined, and in ascertaining that intention effect must be given to all the provisions of the contract. Sykes v. Nationwide Mutual Ins. Co., 413 Pa. 640, 198 A.2d 844 (1964); Breen v. Rhode Island Ins. Co., 352 Pa. 217, 42 A.2d 556 (1945). In a written contract the intent of the parties is the writing itself and when the words are clear and unambiguous the intent is to be determined only from the express language of the agreement. East Crossroads Center, Inc. v. Mellon-Stuart Co., 416 Pa. 229, 205 A.2d 865 (1965); Siciliano v. Misler, 399 Pa. 406, 160 A.2d 422 (1960); Kennedy v. Erkman, 389 Pa. 651, 133 A.2d 550 (1957); Atlantic Refining Co. v. Wyoming Nat'l Bank of Wilkes-Barre, 356 Pa. 226, 51 A.2d 719 (1947); Commonwealth v. Nelson-Pedley Const. Co., 303 Pa. 174, 154 A. 383 (1931). "When a written contract is clear and unequivocal its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed. Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence." East Crossroads Center, Inc. v. Mellon-Stuart Co., supra at 230-31, 205 A.2d at 866. Furthermore, this Court long ago emphasized that "[t]he parties have the right to make their own contract and it is not the function of this Court to rewrite it, or give it a construction in conflict with the accepted and plain meaning of the language used." Hagarty

v. William Akers, Jr., Co., 342 Pa. 236, 20 A.2d 317 (1941).

To these may be added the principle, of particular application here, that every agreement is made and to be construed with due regard to the known characteristics of enterprises in which they are engaged and that the language used in a contract will be construed according to its purport in that particular enterprise. *Franklin Sugar Refining Co. v. Howell*, 274 Pa. 190, 118 A. 109 (1922).

The trial court, accepting Youngstown's thesis and the opinions expressed by its witnesses, concluded that while the word rates used in the first sentences of paragraph Fifth and Sixth meant the charges made by Latrobe for its water, the word service in the last sentence of paragraph Sixth meant both service and rates with the result that Latrobe might not charge rates to Youngstown different from those charged its other metered customers, and this in perpetuity.

The word service was defined in Section 1 of the Public Service Company Law, Act of July 26, 1913, P.L. 1374, as including "any and all acts, done ... and all things ... supplied by public service companies in the performance of their duties to these patrons." While the word rate was not defined in the 1913 Act, the word is used in other provisions of that Act to denote the charges made by a utility for its service. Both words were defined in the Public Utility Law, Act of May 28, 1937, P.L. 1053, the word service in a fashion not materially different from the definition given in the 1913 enactment and the word rate as "every ... charge ... made ... for any service ... furnished by a public utility." The current Public Utility Code of July 1, 1978, P.L. 598 at 66 Pa. C. S. §101 *et seq.* defines both words — rate as the charge made by the utility for its service and service as the things supplied by the utility. While the two words are not ex-

pressly defined in the Municipality Authorities Act of 1945, no doubt because the Legislature saw no reason again to do so, each is used in a fashion comporting with its definitions in the several public utility companies statutes just referred to. For instance, in Section 306(B)(h), 53 P.S. §306(B)(h), it is written that "[a]ny person questioning the reasonableness or uniformity of any rate fixed by any Authority of the adequacy, safety and reasonableness of the Authority's services" may sue in common pleas. Instructive also in this connection is the case *Commonwealth v. Equitable Gas Co.*, 415 Pa. 113, 116, 202 A.2d 11, 13 (1964), holding *inter alia*, that although the phrase public utility service was used but not defined in the tax statute there under scrutiny, there was no reason why the Legislature, having defined the term in the Public Utility Law, "should engage in repetitive definition of an already well understood term."

The words rate and service and their respective meanings have also been the subject of litigation. In *Commonwealth v. Fidelity & Deposit Company*, 355 Pa. 434, 50 A.2d 211 (1947), the plaintiff insurance company sued a contractor's surety on a compliance bond due and to recover premiums on policies of workmen's compensation insurance issued for the contractor, contending that it, the plaintiff, in issuing workmen's compensation insurance was supplying "services rendered by public utilities," one of the items of coverage by the compliance bond. The Supreme Court in holding against the plaintiff that "[t]he phrase 'for service rendered by public utilities' was obviously intended to cover facilities such as electricity, gas and telephone supplied by public utilities." In *Penn-Harris Hotel Co. v. Pennsylvania Public Utility Commission*, 166 Pa. Superior Ct. 394, 71 A.2d 853 (1950), the court held commissions allowed by a telephone company to subscriber hotels operating a semi-public

branch service were not rates required to be included in tariffs because they were not compensation received by the utility for services rendered by it, but payment for services rendered to the utility. *See also Hickey v. Philadelphia Electric Company*, 122 Pa. Superior Ct. 213, 184 A. 553 (1936).

Latrobe and Youngstown were both created and operating their enterprises under the provisions of the Municipality Authorities Act of 1945. The language of their contract is to be construed according to its purport in the enterprise in which they were engaged. *Franklin Sugar Refining Co. v. Howell, supra*. Where they used the word rates in the contract they entered into in 1959, they must be taken to have meant what the word denotes in the world of public utilities — the compensation which the customer, Youngstown, would pay the supplier, Latrobe for the latter's water; and when they used the word services they must be taken to have meant the act done and the facilities used and the water to be supplied by Latrobe to Youngstown.

The parties clearly expressed their intention that the words rates and services should have their usual meanings. In the first sentence of paragraph Fifth Youngstown agrees to purchase the water at Latrobe's "then existing rates"; in the first sentence of paragraph Sixth Latrobe agrees to supply Youngstown water at the former's "rates established at the time of delivery." The remainder of paragraph Sixth concerns the service to be provided by Latrobe. Latrobe agrees to use care to prevent interruptions and fluctuations in the service, warns that there may be breaks and repairs which will require curtailment of service and in the last sentence argues also that "it *will not operate* its service to Youngstown in such manner as to place Youngstown or its customers in an unreasonable disadvantage to the customers of Latrobe." It is inconceivable that the parties meant "operate its service to Youngstown" to refer

to the rates to be charged for the service. The plain meaning and the intention of these paragraphs was to provide that Youngstown would pay for the water at rates established by Latrobe at the time of delivery and that Latrobe would not operate its service to Youngstown or its customers so as to disadvantage the latter.

We observe that our reading of the contract is consonant with the principle that, the price charged for utility services having been made the subject of regulations by the state, individuals cannot, by contract, abridge the police powers of the Commonwealth which protect the general welfare and the public interest. *See Leiper v. Baltimore and Philadelphia Railroad Company*, 262 Pa. 328, 105 A. 551 (1918); *Blythe Township Municipal Authority v. Pennsylvania Public Utility Commission*, 199 Pa. Superior Ct. 334, 185 A.2d 628 (1962); *Henshaw v. Fayette Gas Co.*, 105 Pa. Superior Ct. 564, 161 A. 896 (1932). While the cases just cited have to do with rates subject to regulation by the Public Utility Commission we see no reason why the principle should not apply in the case of municipal authorities whose rates are required by Section 306B(h) of the Municipality Authorities Act of 1945 to be reasonable and uniform and made subject to review by the common pleas courts which are given jurisdiction "to determine all such questions involving rates and service." Of course, if Youngstown believes that the reclassification and rate change imposed by Latrobe are not reasonable and uniform, it may by the authority just cited, ask the court to review them.

Decree reversed.

### Order

And Now, this 15th day of February, 1983, the order of the Court of Common Pleas of Westmoreland County in the above matter is hereby reversed.

DISSENTING OPINION BY JUDGE BLATT:

I respectfully dissent.

The trial judge held that the contract language was ambiguous, and therefore permitted the testimony of the consulting engineer and of Youngstown's solicitor relating to the adoption of the agreement and the intent of the parties at that time. In particular, the trial judge found that portions of paragraph six, underscored in the majority opinion and stating that "Latrobe will not operate its service to Youngstown in such a manner as to place Youngstown or its customers in an unreasonable disadvantage to the customers of Latrobe" were ambiguous as written.[1]

The parol evidence rule certainly remains viable in this Commonwealth. However, as stated by our Supreme Court:

> It is well established that, where a written instrument is ambiguous, either party may produce oral evidence to resolve the ambiguity, such evidence being admitted, not to add to or detract from the writing, but merely to ascertain the meaning of the parties. The authorities so holding are legion.

*Morgan v. Phillips*, 385 Pa. 9, 14, 122 A.2d 73, 76 (1956) (citing numerous cases).

Believing that the trial judge was correct in admitting extrinsic evidence so as to ascertain the intent of the parties, I would affirm.

---

[1] Whether the ambiguity was latent or patent is immaterial in deciding the applicability of the parol evidence rule.