Tamaqua Borough, Schuylkill County, and Tamaqua Borough Authority, Appellants *v.* Rush Township Sewer Authority, Appellee.

Argued May 3, 1984, before Judges CRAIG, BARRY and BLATT, sitting as a panel of three.

*Jeffrey P. Bowe, Bowe, Lisella and Bowe,* for appellants.

*John T. Pfeiffer, III, Pfeiffer, Brown & Baldwin, P.C.,* with him, *Paris J. DeSantis, DeSantis & Menconi,* for appellee.

OPINION BY JUDGE BLATT, October 12, 1984:

Tamaqua Borough and the Tamaqua Borough Authority appeal here an order of the Court of Common Pleas of Schuylkill County which held that a fee of $80.00 per equivalent dwelling unit (EDU) per year was a proper rate to charge Rush Township Sewer Authority (Rush Authority) pursuant to a contract it had with Tamaqua Borough for the treatment of its sewage.

Sometime in February of 1964, the Tamaqua Borough Authority leased its sewer system, including the treatment facilities, to Tamaqua Borough (Borough). Subsequently, on February 14, 1969, the Borough and the Rush Authority entered into a contract which gave the Rush Authority the right to discharge sewage, collected in the Village of Hometown, into the Borough's

sewage system for treatment and disposal in exchange for the sum of $27.00 per year per EDU.

The contract provides in Section 1 that the Rush Authority will connect its sewage system with the Borough's at "the northern Corporate Borough boundary." In addition, the parties agreed to increase the basic fee per EDU set forth in the contract only " [i]n the event that Tamaqua [Borough] . . . [would] have to upgrade the treatment of sewage, the increased costs thereof . . . [would] be prorated between the two (2) municipalities on the same ratio as the E.D.U.'s bear to each other."[1] Section 4B of the Agreement. The trial court found, however, that the original basic fee of $27.00 per EDU per year had been increased on June 30, 1971 to $32.00 and then again on June 28, 1974 to $38.60. In both instances, the Rush Authority paid the increased price.

On October 4, 1972, the Pennsylvania Department of Environmental Resources (DER) ordered the Borough to "enter into agreements with Tamaqua Borough Authority to plan, design, finance, construct and operate sewage facilities to properly collect, convey and *treat* sewage . . . in compliance with Sections 4, 5, 201 and 202 of the Clean Streams Law[2] and Section 91.31 of the Department's Rules and Regulations[3] promulgated thereunder." (Emphasis added.) To comply with the order of DER, the Borough repaired

---

[1] The contract also provides in Section 6 that:

In the event that an analysis of any of the Township's [Rush Authority] sewage waste determines that such sewage waste requires special treatment at the Borough's treatment sewage plant, the Township agrees to pay to the Borough the *actual cost* of such special sewage treatment, or provide pretreatment prior to discharge to the Borough system, as may be agreed upon. (Emphasis added.)

[2] Clean Streams Law, Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§691.1—691.1001.

[3] 25 Pa. Code §91.31.

and expanded its existing sewage collection lines, constructed an independent surface water collection and drainage system to divert surface water away from the sanitary sewer system, and upgraded and enlarged the treatment plant to provide secondary treatment of the sewage collected from the Borough and the Village of Hometown. The cost of the required improvements, construction and upgrading was financed in part by a bond issue.

Following the completion of this project in March of 1975, the Borough determined that the price of maintaining and operating the plant along with the amortization of the bond issue necessitated an increase in the fee charged to residential users in Tamaqua and to the Rush Authority. Consequently, the Borough enacted an ordinance increasing the fee to $96.00 per EDU per year. The Rush Authority, however, paid only $68.00 per EDU per year, contending that under the contract it could be charged only for the cost of upgrading the treatment facility and that the increased fee of $96.00 per EDU per year encompassed not only those costs, but also the monies expended for improvements in the sewage collection system and the construction of the independent collection system for surface waters.

Thereafter, on March 25, 1977, the Borough filed a complaint in equity, which was later transferred to the law side of the court by a stipulation between the parties, to collect alleged arrearages. On May 16, 1977, the Rush Authority filed an answer and a counterclaim seeking to recover the additional sums collected by the Borough as a result of the 1971 and 1974 increases in the basic fee set under the 1969 contract.

Following a non-jury trial, the court concluded that the Rush Authority was liable here under the contract *only* for those costs accrued in upgrading the sewage treatment plant. It then determined that the

cost of upgrading those treatment facilities was $41.00 per EDU per year and it also concluded that the current basic fee set by the contract was $38.60, inasmuch as the parties had legally modified the agreement in 1974. Adding these figures together and rounding them off, the court held that a fee of $80.00 per EDU per year was proper under the current contract. Additionally, the court dismissed the counterclaim filed by the Rush Authority. Both parties filed exceptions to the court's opinion on June 27, 1979 which were subsequently dismissed by opinion and order of the court filed June 27, 1983. The present appeal ensued.

Two of the seven arguments raised by the Borough before this Court deal with a purported lack of "jurisdiction" in the trial court. We will review these contentions first.

The Borough submits preliminarily that the trial court lacked subject matter jurisdiction here. Essentially, it argues that, because the Borough is operating a "public utility" service beyond its corporate boundaries, any challenge to the rates it sets must be brought before the Pennsylvania Public Utility Commission (PUC) pursuant to Section 1501 of the Public Utility Code, 66 Pa. C. S. §1501.[4]

The trial court found, however, that Rush Authority transmitted the sewage collected in the Village of Hometown through its own lines, which ran through Rahn Township, to the northern boundary of the Borough and further that, because the Borough had annexed Rahn Township, the collection line of the Rush

_____

[4] Section 1501 of the Public Utility Code provides, in pertinent part, that:

Any public utility service being furnished or rendered by a municipal corporation beyond its corporate limits shall be subject to regulation and control by the commission as to service and extensions, with the same force and in like manner as if such service were rendered by a public utility.

66 Pa. C. S. §1501.

Authority actually extended for some distance into the Borough. Our review of the record reveals that the trial court made well-supported factual findings when it found that Rush Authority operated and maintained its own collection system within the Village of Home-town, handled all the billing for the residential users there and ran its lines through Rahn Township, which is located within the corporate boundaries of the Bor-ough, prior to connecting with the Borough's sewage system. Therefore, we cannot conclude here that the Borough was operating its sewer system outside its corporate limits.[5]

The Borough also argues that the trial court lacked "jurisdiction" pursuant to Section 4B(h) of the Act, 53 P.S. §306B(h). Section 4B(h) of the Act grants exclusive jurisdiction to the common pleas court to review the reasonableness of rates set by *municipal authorities*. Here, the municipal authority leased its sewage facilities to the Borough and, therefore, the lessee, here the Borough, may establish a reasonable rate pursuant to Section 1 of the Sewer Rental Act, Act of July 18, 1935, P.L. 1286, *as amended*, 53 P.S. §2231. Moreover, Section 2.2 of the Sewer Rental Act, 53 P.S. §2234 provides that the Sewer Rental Act "shall be in addition to and not in limitation of those [rights, powers and privileges] granted by the Municipality Authorities Act of one thousand nine hundred forty-five. . . ." Consequently, we believe that where, as here, the municipal authority leases its sewage facilities to a borough, the common pleas court has exclusive jurisdiction to review the reasonableness of rates set by the borough.

---

[5] Even if we were to find that the Borough operated its system outside its corporate limits, the court of common pleas would have subject matter jurisdiction here. See *Graver v. Pennsylvania Public Utility Commission*, 79 Pa. Commonwealth Ct. 528, 469 A.2d 1154 (1984).

A careful reading of the Borough's argument challenging the trial court's "jurisdiction" under the Act leads us to believe that the Borough is, in essence, arguing that the trial court erred in reviewing the reasonableness of the rate established by the Borough inasmuch as the action before it was one to collect arrearages. The Borough contends, citing Judge KRAMER's concurring opinion in *Patton-Ferguson Joint Authority v. Hawbaker,* 14 Pa. Commonwealth Ct. 402, 322 A.2d 783 (1974), that a collateral attack by Rush Authority on the reasonableness of its rate was improper. We believe, however, that the facts here are distinguishable from those in *Patton-Ferguson Joint Authority* and, of course, a concurring opinion, while certainly persuasive, is not binding on this Court.

In *Patton-Ferguson Joint Authority,* the Authority, like the Borough here, brought an action to collect overdue sewer fees; but, unlike this case, no contract term limiting rate increases was in effect between the user and the Authority. Here, the Borough and the Rush Authority entered into a legal agreement which, on its face, limits any increase in the annual charge per EDU to increases stemming from the upgrading of the Borough's treatment facilities and we note that neither party is challenging the legality of the 1969 agreement. We believe, therefore, that when the Borough brought an action to collect alleged arrearages, the Rush Authority could properly raise the defense that the increase imposed by the Borough encompassed more than just the costs of upgrading. The trial court, in deciding whether or not arrearages were due and, if so, in what amount, would have to determine the actual costs of upgrading the treatment facilities. Therefore, the Rush Authority was not making an improper collateral attack on the rate here.

Assuming, *arguendo*, that the trial court properly exercised its jurisdiction, the Borough argues next that the trial court applied the wrong standard in reviewing the reasonableness of the rate here. The Borough maintains that the court was limited to determining whether or not it had committed a manifest and flagrant abuse of discretion in setting the rate at $96.00 per EDU per year. Although we agree with the Borough's restatement of the scope of review in rate cases argued before a court of common pleas, *Brandywine Homes v. Caln Township Municipal Authority,* 19 Pa. Commonwealth Ct. 193, 339 A.2d 145 (1975), we are not convinced that the trial court was faced squarely with an issue involving the reasonableness of an established rate. Here, the nature of the Borough's action to collect alleged arrearages under the contract dictated that the trial court would construe the contract and render a decision based upon its analysis of the agreement before it. Therefore, we do not believe that this case represents a traditional rate review and, consequently, the court was not limited to determining whether or not the Borough had abused its discretion.

The Borough also raises several arguments concerning the trial court's interpretation of the agreement between it and Rush Authority. In each of these arguments, the Borough contends that the 1969 contract provides for increases in the annual rate due to the increased costs of operating and maintaining the Borough's sewer system.

First, the Borough maintains that the agreement was modified so as to legally bind Rush Authority to pay its proportionate share of future increased costs in operation when Rush Authority paid increases levied in 1971 and in 1974 by the Borough. The Borough states that the increases instituted in 1971 and 1974 were to cover operating costs and that, therefore,

Rush Authority has impliedly agreed to pay all future charges reflecting such increases.

In dismissing the Borough's exceptions, the trial court stated that the 1969 agreement had been modified by the actions of the parties[6]—*i.e.* the Borough increased the basic fee of $27.00 set by the contract in 1971 to $32.00 and in 1974 to $38.60 and the Rush Authority paid those increases without complaint. *See McBride v. Davis,* 266 Pa. Superior Ct. 125, 403 A.2d 125 (1979) (a subsequent modification of a contract may be made in writing, by words or *by conduct*). It specifically did not hold that the modification contained an implied agreement to pay all future increases in the basic fee due to increasing operating costs, reasoning that "[t]he modification assented to by both Rush and Tamaqua in a fixed amount became a new contractual undertaking but became only that and did not indicate Rush's assent to any and all increases which Tamaqua found necessary to operate its system." *Tamaqua Borough and Tamaqua Borough Authority v. Rush Township Sewer Authority,* No. S-488, slip op. at 4 (Court of Common Pleas of Schuylkill County June 27, 1983).

Our review of the facts here and the relevant case law convinces us that the trial court was correct in holding that the agreement was modified here only to the extent that a new basic fee was agreed upon in 1971 and 1974. The Borough asks us to imply that the modification included an understanding as to future increases resulting from operating costs but it has

---

[6] The Rush Authority maintains throughout its argument before this Court that it did not assent to the increase in payments in 1971 and in 1974 and that, consequently, no legal contract modification occurred. We note that this argument was the basis for its counterclaim before the court of common pleas and that it was dismissed. Inasmuch as the Rush Authority has failed to file an appropriate cross-appeal, we believe it has waived this argument.

failed to offer any evidence on this point. And where a written contract is modified by subsequent conduct of the parties, we believe that the extent of the modification must be shown by clear and convincing evidence. *Accord Nicolella v. Palmer,* 432 Pa. 502, 248 A.2d 20 (1968) (subsequent oral modification must be established by clear and convincing evidence).

The Borough next argues that the 1969 agreement contains an implied term obligating the Rush Authority to pay its proportionate share of the increased cost of operations. It contends that the 1969 contract does not represent the entire agreement. In particular, the Borough submits that, because the contract is silent on the subject of whether or not the Rush Authority is responsible for increased operating costs, parole evidence may be admitted to prove the existence of such an implied term. The Borough then maintains that the actions of the Rush Authority in 1971 and in 1974 in paying the increased fee are evidence of an implied term in the 1969 agreement to share in the increased costs of operating. Furthermore, the Borough argues that an implied term is mandated by its statutory right to set rates pursuant to Section 4B(h) of the Act, *as amended,* 53 P.S. §306B(h) and Section 2 of the Sewer Rental Act, *as amended,* 53 P.S. §2232.

The Pennsylvania Superior Court stated in *D. B. Van Campen Corp. v. Building and Construction Trades Council of Philadelphia* that:

> In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do *in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy the other party's right to receive the fruits of the Contract.*

202 Pa. Superior Ct. 118, 122, 195 A.2d 134, 136 (1963). Here, the clear intent of the parties was to reach an agreement whereby the Borough would treat and dispose of the sewage collected by Rush Authority for a fee.

We do not believe that the absence of a provision accounting for future increases in the cost of operating the *Borough's sewage system* renders the 1969 agreement impossible to perform. And, in fact, the parties have been performing under the contract despite their inability to agree on the fee. The Borough's failure here to negotiate a term to cover any future costs of operating *the treatment facility* does not injure its right to collect the fee established by the contract and, we certainly do not agree with the Borough that Rush Authority impliedly agreed to contribute to the increasing costs of operating the Borough's *entire sewage system.*

As to its statutory right to set rates, we believe that, in negotiating this contract with Rush Authority, the Borough waived any right to increase the basic fee *except where the costs could be attributed to the upgrading of the treatment facility.* Again, the Borough points to the increases it imposed in 1971 and in 1974 as evidence that it did not assent to the waiver of its statutory right to set rates here unilaterally. However, while the increases are evidence of assent by both parties to modify the 1969 agreement, we remain unconvinced that they negate what was so clearly set forth in the contract—*i.e.* that the Borough could increase the basic annual fee per EDU only to cover the cost of upgrading the treatment facilities.

The Borough also asserts that, when the doctrine of equitable estoppel is applied to the facts before us, the Rush Authority is estopped from asserting that it is not liable for its proportionate share of the increased costs of operation. The Borough argues that

it was misled into believing that the Rush Authority had agreed to pay a fair share of any increase in operating costs when the Rush Authority acquiesced to such increases in both 1971 and 1974. It further contends that it has relied on such belief to its detriment here because it has consequently failed to set a high enough rate for its residents.

The court found, however, that the Borough failed to offer proof that it was misled by the Rush Authority's actions or that it reasonably relied on those actions. Furthermore, the court noted that the improvements to the sewage system, including those to the treatment facility, were undertaken by the Borough in compliance with the October 4, 1972 order of DER and that, consequently, any change in position by the Borough was as a result of that order and not due to the actions of the Rush Authority. Inasmuch as the Borough failed to carry its burden to prove equitable estoppel, we must agree with the court's analysis. *See Blofsen v. Cutaiar,* 460 Pa. 411, 333 A.2d 841 (1975).

The Borough argues finally that the trial court improperly calculated the cost of upgrading the treatment facilities. Essentially, it maintains that the court erred in not including the costs of constructing an independent system to divert surface water from the sanitary sewer system in its calculations. Initially, we note that the Borough does agree that these costs were not directly related to upgrading the treatment facilities. It argues, however, that, because the court found that the construction of a storm drainage system would benefit the residents of the Village of Hometown as well as the residents of the Borough, the court erred in not including these costs in its calculations.

Again, the 1969 agreement provides that the Rush Authority is liable only for increases in the annual rate stemming from the upgrading of the Borough's

treatment facilities. It is irrelevant that the construction of the storm drainage sysem benefitted the residents of the Village of Hometown, for they are not liable for such costs under the contract.

Furthermore, we note that the court, in reaching its conclusion that the cost of upgrading the treatment facility was $41.00 per EDU per year, accepted the evidence of an engineering expert who testified on behalf of the Rush Authority rather than the testimony of the Borough's expert. And, of course, the trial court, sitting here without a jury, is entitled to decide the credibility of the witnesses and may believe one expert over another. *Lawner v. Englebach,* 433 Pa. 311, 249 A.2d 295 (1969). Our thorough review of the record here has convinced us, therefore, that the findings of the trial court are based on substantial evidence and we will not disturb them on appeal. *Spatz v. Nascone,* 283 Pa. Superior Ct. 517, 424 A.2d 929 (1981).

Accordingly, we will affirm the decision of the Court of Common Pleas of Schuylkill County.

ORDER

AND Now, this 12th day of October, 1984, we hereby affirm the order of the Court of Common Pleas of Schuylkill County in the above-captioned matter.