535 A.2d 725

Township of Aston and Francis J. Robinson *v.* Southwest Delaware County Municipal Authority and Middletown Township, Delaware County Sewer Authority. Township of Aston, Appellant.

Argued September 15, 1987, before Judges CRAIG and MACPHAIL, and Senior Judge NARICK, sitting as a panel of three.

*Nicholas J. Emper, Eckell, Sparks, Levy, Auerbach & Monte,* for appellant.

*Janice M. Sawicki,* for appellee, Southwest Delaware County Municipal Authority.

*Robert B. Surrick,* for appellee, Middletown Township, Delaware County Sewer Authority.

OPINION BY SENIOR JUDGE NARICK, January 11, 1988:

This is an appeal by the Township of Aston (Aston) from the order of the Court of Common Pleas of Delaware County denying Aston's request to void the contract entered into between its municipal sewer authority and that of Middletown Township.

The facts at trial were stipulated. In 1957, Aston, by way of ordinance, formed the Southwest Delaware County Municipal Authority (Southwest) pursuant to Section 3 of the Municipality Authorities Act of 1945 (Act), Act of May 2, 1945, P.L. 382, *as amended,* 53 P.S. §303. The function and purpose of the Authority was to provide for the treatment and disposal of sewage from Aston Township and those surrounding municipalities wishing to utilize the plant and its facilities. The present participating municipalities are Aston Township, Middletown Township, Chester Township, Upper Chichester Township, and Brookhaven Borough.

On January 10, 1968, Southwest entered into a contract with Middletown Township, Delaware County, Sewer Authority (Middletown) which enabled Middletown to connect to the Southwest system and use Southwest's treatment plant. Section 5 of the agreement provided for the method of calculating Middletown's payments for use of the sewage treatment plant. That section set the current rate charged to Middletown by Southwest at $23.85 annually per E.D.U. (equivalent dwelling unit). The agreement was initially for a 40-year period and did not provide for an increase in the above-stated annual rate per E.D.U. over the life of the con-

tract, which was subsequently, by agreement of the parties, extended to a 50-year term.

Southwest, in September 1984, and again in July 1985, adopted a resolution increasing Middletown's rate to $74.70 per year per E.D.U. On both occasions, Middletown refused payment of the increased rate, insisting that the rate was fixed by the 1968 Sewage Treatment Agreement at $23.85 and could not be increased during the term of the contract. The present rate charged by Southwest to the other participating municipalities for sewage treatment costs is approximately $80 per year per E.D.U.

Aston alleged in its complaint that Southwest exceeded its authority as set forth in Section 4B(h) of the Act, 53 P.S. §306B(h) by entering into an agreement with Middletown which prevented Southwest from charging a "reasonable and uniform" rate to all users. Aston requested that the agreement be voided so as to allow Southwest to establish a reasonable and uniform rate for all users. Following a non-jury trial, the trial court denied Aston's request, and this appeal followed.

Aston's essential argument is that the contract between Southwest and Middletown should be set aside as illegal because it is violative of Southwest's statutory duty, under Section 4B(h) to fix reasonable and uniform rates. Middletown counters that Section 4B(p) of the Act, 53 P.S. §306B(p), is the controlling provision in that it allows a municipal authority to contract with other municipalities or authorities to supply water and other services and to fix the rate of payment. Having entered into a valid contract with a fixed rate term under Section 306B(p), Middletown asserts that Southwest has waived its right to alter that term for the life of the contract, and that Aston, as a stranger to the contract, cannot seek to have it voided. We agree.

We note initially that Aston has not argued that the Southwest-Middletown contract was illegal *ab initio*,

nor are there allegations of fraud, accident or mistake. Further, we have not been asked to interpret the contract itself, which is not alleged to be ambiguous. Rather, Aston acknowledges that the contract clearly sets forth the maximum dollar amount per E.D.U., the present $23.85. It contends that the contract became "illegal" when the $23.85 per E.D.U. became disproportionate to the amount paid by other Southwest facility users for the same service. The primary authorities cited for this proposition are Section 4B(h) and this Court's opinion in *Latrobe Municipal Authority v. Youngstown Borough Municipal Authority,* 72 Pa. Commonwealth Ct. 84, 456 A.2d 234 (1983), wherein our Supreme Court's opinion in *Leiper v. Baltimore and Philadelphia Railroad Company,* 262 Pa. 328, 105 A. 551 (1918) is cited.

In pertinent part, Section 4B(h) provides:

B. Every Authority is hereby granted, and shall have and may exercise all powers necessary or convenient for the carrying out of the aforesaid purposes, including but without limiting the generality of the foregoing, the following rights and powers:

. . .

(h) To fix, alter, charge and collect rates and other charges in the area served by its facilities at reasonable and uniform rates to be determined exclusively by it. . . . Any person questioning the reasonableness or uniformity of any rate fixed by any Authority or the adequacy, safety and reasonableness of the Authority's services, including extensions thereof, may bring suit against the Authority in the court of common pleas. . . .

In *Latrobe,* this Court was called upon to interpret a contract between two municipal authorities in an action for specific performance. Under the contract, Latrobe

sold water to Youngstown. During the course of the contract, Latrobe instituted reclassification of its users. As a result of its reclassification, Youngstown's rate was increased. The contract there at issue, as the Court interpreted it, provided that Latrobe would sell water to Youngstown at such rates as were in effect at the time of delivery of the water. The Court noted that the contract "impose[d] no restraint on Latrobe's power conferred on it by Section 4B(h) of the [Act]." *Latrobe,* 72 Pa. Commonwealth Ct. at 88, 456 A.2d at 237. Despite the dicta in the last paragraph of the opinion discussing the inability of private parties to abridge by contract the police powers of the Commonwealth, *id.,* 72 Pa. Commonwealth Ct. at 94, 456 A.2d at 239-240, *citing Leiper,* the *Latrobe* court was not faced with, and did not decide the question of whether Latrobe could have validly fixed a rate by contract with another municipality or municipal authority according to the terms of Section 4B(p) of the Act. *Latrobe* is thus distinguishable from the case before us.

Middletown urges that Section 4B(p) must govern the outcome here. That section provides that a municipal authority shall have the right and power "[t]o enter into contracts to supply water and other services to and for municipalities that are not members of the Authority, or to and for the Commonwealth of Pennsylvania, municipalities, school districts, persons or authorities, and fix the amount to be paid therefor." While Section 4B(h) speaks of fixing reasonable and uniform rates "in the area served by [a municipality authority's] facilities," there is no such limitation where an authority contracts with another, presumably outside that area. In the case of a contract under Section 4B(p), a municipal authority is given the power to fix the rates to be paid for its services, without the statutory limitation that they be "reasonable and uniform." The discrepancy is not illogical when the difference between the two situations is

examined. In the first case, under Section 4B(h), a municipal authority is granted the exclusive authority to set rates for its services. The recipient of these services has no input into the ratemaking process. It is therefore protected by the provision requiring the rates to be reasonable and uniform and subject to judicial review. Such is not the case when two municipal bodies contract for services, as under Section 4B(p). That section allows a municipal authority to fix the rate for its services, but that rate, of course, will be the subject of negotiation before a contract is concluded. There is nothing in the statute to prevent the inclusion of a clause providing for periodic rate increases and, conversely, nothing to prohibit setting a maximum rate. Hence, under Section 4B(p), legal authority exists for the Southwest-Middletown contract.

As Middletown points out, this Court recognized the binding nature of this type of contract in *Tamaqua Borough v. Rush Township Sewer Authority*, 85 Pa. Commonwealth Ct. 421, 482 A.2d 1167 (1984), a case decided subsequent to *Latrobe*. Therein, Tamaqua Borough contracted with Rush Authority to provide sewage treatment and disposal services in exchange for the sum of $27.00 per E.D.U. per year. The contract provided that, in the event Tamaqua was required to upgrade its sewage treatment facilities, the two parties would share the cost. Years later, Tamaqua made substantial changes in upgrading its system in compliance with a Pennsylvania Department of Environmental Resources order, including the construction of a surface water drainage system. When Tamaqua attempted to bill Rush for its pro-rata share of the cost of all the improvements, Rush contended it was only liable for its share of costs applicable to upgrading the sewage treatment plant. This Court adopted Rush's position, concluding that Tamaqua was bound by the terms of its contract: "As to its statu-

tory right to set rates, we believe that, in negotiating this contract with the Rush Authority, the Borough waived any right to increase the basic fee except where the costs could be attributed to the upgrading of the treatment facility." *Tamaqua,* 85 Pa. Commonwealth Ct. at 431, 482 A.2d at 1173 (emphasis deleted).

Aston attempts to distinguish *Tamaqua* on two grounds. First, it contends that the case stands for the proposition that a reasonable contractual method of calculating rate increases will be enforced. However, while the contract did provide for increases to the basic rate in order to cover the costs of upgrading the system, the basic rate otherwise remained the same. The Court found, however, that Tamaqua had unilaterally raised the basic rate on two occasions, and that, by accepting the new rate without protest, Rush had modified the parties' contract by conduct. Therefore, the new rate would apply, but Rush's acceptance of that rate did not function as an implied acceptance of periodic unilateral increases. Secondly, Aston argues that, as the Court pointed out in *Tamaqua,* the legality of the contract therein was not at issue. As Aston has summarized its position in its brief, "it is the essence of Aston's complaint that it was outside the authority of Southwest to enter into such a contract which restricted its ability [under Section 4B(h)] to establish 'reasonable and uniform' rates." However, having found statutory authority for the contract in Section 4B(p), we conclude that the Southwest-Middletown contract is valid, and must be governed by our decision in *Tamaqua.*

Accordingly, the order of the trial court is affirmed.

### ORDER

AND NOW, this 11th day of January, 1988, the order of the Court of Common Pleas of Delaware County in the above-captioned matter, is affirmed.