597 A.2d 757

**The TOWNSHIP OF RACCOON and the Raccoon Township Water Authority, Appellants,**

v.

**The MUNICIPAL WATER AUTHORITY OF the BOROUGH OF ALIQUIPPA, Appellee.**

Commonwealth Court of Pennsylvania.

Argued Feb. 14, 1991.

Decided Sept. 26, 1991.

Reargument Denied Nov. 11, 1991.

Dale M. Fouse, for appellants.

Clarence D. Neish, for appellee.

Before PELLEGRINI and KELLEY, JJ., and SILVESTRI, Senior Judge.

SILVESTRI, Senior Judge.

The Township of Raccoon [1] and the Raccoon Township Water Authority (Raccoon) appeal from the trial court's

[1]. The Township of Raccoon is a party to this action by reason of its pledge to "satisfy any indebtedness of Raccoon Township Water Authority" under a certain bond issue and agreement with the Federal Home Administration which bond issue financed the construction of the water distribution system (Complaint, paragraph 17). The propri-

denial of their motion for post-trial relief from a verdict declaring the multi-minimum rate for Raccoon's purchase of water from the Municipal Water Authority of the Borough of Aliquippa (Aliquippa), effective January 1, 1986, valid and enforceable.

Raccoon and Aliquippa are both bodies corporate pursuant to Section 4 A(a)(10) of the Municipality Authorities Act of 1945 (Act)[2] for the purpose of "acquiring, holding, constructing, improving, maintaining and operating, owning, leasing, either in the capacity of lessor or lessee, projects of the following kind and character ... waterworks, water supply works, water distribution systems...."

Aliquippa owns, operates and maintains a facility for the production of potable water and a distribution system within its service area which is the City of Aliquippa; Raccoon does not have any facilities for the production of potable water but owns, operates and maintains a distribution system within its service area which is the township of Raccoon. On February 19, 1973, Aliquippa and Raccoon entered into a contract whereby Aliquippa agreed to sell potable treated water to Raccoon with delivery thereof at a designated point.

Raccoon, in addition to servicing water users in Raccoon Township, also served Potter Township, which had 219 households, with water it bought from Aliquippa. At all times relevant herein, in addition to Aliquippa selling water to Raccoon for resale to users in Raccoon's service area, Aliquippa also sold water to other water authorities, being Hall Avenue Water Company (Hall) and Division Street Water Company (Division),[3] for resale to users in their respective service area.

Aliquippa, in 1984, adopted a multi-minimum rate for all its customers within the City of Aliquippa. On December 2, 1985, Aliquippa adopted resolution 85–5 of 1985, effective

ety of the Township being a party has not been raised, and is not an issue, and not material to the disposition of this appeal.

2. Act of May 2, 1945, P.L. 382, *as amended,* 53 P.S. § 306 A(a)(10).

3. Division Street Water Company was absorbed by Aliquippa in 1987.

January 1, 1986, establishing the same multi-minimum rate for users outside the City of Aliquippa. This effected an increase in rates not only for Raccoon, but also for Hall and Division.

On September 4, 1987, Raccoon filed this declaratory judgment action pursuant to the Declaratory Judgments Act[4] and Pa.R.C.P. No. 1601(a)[5] against Aliquippa alleging that resolution 85–5 has established an arbitrary classification of purchasers so as to discriminate against non-Aliquippa Borough residents (paragraph 8); that resolution 85–5 imposing the rate increases is a a flagrant abuse of discretion in violation of and contrary to 53 P.S. Section 306, Subsection (h) in that it is unreasonable and an arbitrary establishment of rates (paragraph 9); that the water rate increase does not reasonably relate to the value of service rendered by Aliquippa to Raccoon (paragraph 10); the rates are not uniform (paragraph 11); that resolution 85–5 effectuates a discrimination against non-Aliquippa Borough residents (paragraph 12); that resolution 85–5 and its implementation represent a breach of the 1973 water purchase agreement between the parties (paragraph 13). Raccoon sought the following relief: (1) declare Resolution 85–5 together with the consequent and subsequent rate increase invalid; (2) that Raccoon is not indebted to Aliquippa for any sums in excess of the rates established by the 1973 agreement of the parties; and, (3) such other relief as the Court deems appropriate.[6]

4. 42 Pa.C.S. §§ 7531–7541.

5. Pa.R.C.P. No. 1601(a) provides:
 (a) A plaintiff seeking only declaratory relief shall commence an action by filing a complaint captioned "Action for Declaratory Judgment". The practice and procedure shall follow, as nearly as may be, the rules governing the Action in Equity.

6. Simultaneously with filing the declaratory judgment action, Raccoon filed a petition for an injunction. The petition alleged that although Raccoon has paid Aliquippa for water since January 1, 1986 at the 1973 contract rate, it had not paid any of the increase in rates resulting from the adoption by Aliquippa of the multi-minimum rate effective January 1, 1986 and that by letter dated August 6, 1987, Aliquippa threatened to terminate water service to Raccoon and its

After a series of hearings, spanning a year and eight months, the trial court entered a "Judgment" on December 1, 1989, as follows:

1. Resolution No. 85–5 of the Defendant, Municipal Water Authority of Aliquippa, is a valid and enforceable Resolution.

2. The rate increases imposed by Resolution No. 85–5 are presently due and owing by the Plaintiffs to the Defendant for the period of January 1, 1986 to December 1, 1989 and shall be paid not later than ninety (90) days from the date of this Judgment.

3. The Plaintiffs' payments to the Defendant for water service actually received on and after December 1, 1989 shall be consistent with this Judgment and in accord with the usual billing practice between the parties.

Raccoon filed a timely motion for post-trial relief requesting the trial court to direct the entry of judgment in its favor because (1) the 1973 contract between Raccoon and Aliquippa did not permit multi-minimum billing of Raccoon by Aliquippa; (2) resolution 85–5 of Aliquippa was arbitrary and a flagrant abuse of discretion; (3) the commodity

customers by September 9, 1987. Raccoon sought to enjoin Aliquippa from terminating water service pending final determination of the declaratory judgment action.

Aliquippa filed an answer to Raccoon's petition and New Matter. The new matter alleged that Raccoon was delinquent in payment of water at the rate established by resolution 85–5 and requested that Raccoon's petition for an injunction be dismissed and, alternatively, order that Raccoon pay for the water in accordance with the rates set forth in resolution 85–5.

By order dated September 18, 1987, the petition for injunction as requested by Raccoon was granted and Aliquippa was "enjoined from terminating water service to Raccoon Township Water Authority pending final disposition of the declaratory judgment action...."

On October 20, 1987, the trial court entered a supplemental order in which "the preliminary injunction sought by Defendant which, if granted would require Plaintiffs to pay in full all sums it has been billed by Aliquippa for water supplied since 1986, is hereby denied."

Following the appeal to this court by Raccoon, the trial court, by order dated the 18th day of July, 1990, continued in effect the preliminary injunction restraining Aliquippa from terminating service and also restraining Aliquippa from seeking payment of all sums due after January 1, 1986.

demand method used by Aliquippa to establish the multi-minimum rate as it relates to Raccoon fails to consider that Aliquippa's rate schedule includes an 8–inch meter rate which is based on the commodity demand method and Raccoon is an 8–inch meter customer; (4) Raccoon owns, operates and maintains the distribution system for water within its service area; (5) the trial court erred in construing resolution 85–5 to impose multi-minimum billing on Raccoon. On June 18, 1990, the trial court denied Raccoon's motion for post-trial relief and, in its opinion, noted that Raccoon's post-trial relief motion "raise[s] essentially the same issues as were raised by Plaintiffs at the time of trial ..." which it addressed in its opinion filed December 1, 1989, denying Raccoon's declaratory relief.

Essentially Raccoon presents to us the same issues raised in its post-trial relief motion. After an extensive review of the record we affirm the trial court; however, not for all the same reasons.[7]

The Declaratory Judgment Act authorizes the construction, *inter alia*, of "contracts" and "statutes." 42 Pa.C.S. § 7533. Here, we have a contract between the parties as well as a governing statute. The statute involved is, as herein relevant, section 4 B(p), 53 P.S. § 306 B(p), which is as follows:

B. Every Authority is hereby granted, and shall have and may exercise all powers necessary or convenient for the carrying out of the aforesaid purposes, including but without limiting the generality of the foregoing, the following rights and powers:

. . . . .

(p) To enter into contracts to supply water and other services to and for municipalities that are not members of the Authority, or to and for the Commonwealth of Pennsylvania, municipalities, school districts, persons or authorities, and fix the amount to be paid therefor.

7. *Holland v. Norristown State Hospital,* 136 Pa.Commonwealth Ct. 655, 584 A.2d 1056 (1991) (May affirm a decision based upon grounds different from those relied upon by the trial court).

The contract is that of February 19, 1973 between Raccoon and Aliquippa. The terms of which, as herein relevant, are that Aliquippa agreed to furnish Raccoon:

A-1. [A]t the point of delivery, potable water in such quantity ... not to exceed nine (9) million gallons per month, and not to exceed 800[8] customers. (Footnote added.)

In paragraph 4, Aliquippa was to bill Raccoon not later than the 10th day of each month with an itemized statement of water furnished to Raccoon. Raccoon agreed to pay Aliquippa:

B-1. [N]ot later than the 20th day of each month for water delivered in accordance ... to the Municipal Water Authority of Aliquippa's Standard Adopted Rates....

It was mutually agreed between Aliquippa and Raccoon, for modification of the contract:

C. * 5. That *the provisions of the contract pertaining to Schedule of Rates to be paid by the Purchaser for water are subject to modification by the Seller at any time.* It is noted that the Seller is required, in accordance with the terms of its Trust Indenture, to *modify rates periodically as recommended by its consulting engineer, which recommendation is based on the total cost of the Seller's operations.* It is further noted that *the Seller,* in accordance with its Trust Indenture, *must apply rate modifications equally to all like consumers purchasing water from the Seller. Other provisions of this contract may be modified or altered by mutual agreement of the parties to said contract.* (Emphasis added.)

Prior to the establishment of the multi-minimum rate by Aliquippa, the water sold to Raccoon by Aliquippa under the 1973 contract was to be measured by metering equipment "properly measuring the quantity of water delivered to" Raccoon. The metering equipment was to be read monthly and Aliquippa was to furnish Raccoon an itemized state-

8. In 1979 the number, by agreement of the parties, was raised to 1200.

ment of the amount of water furnished during the preceding month. Raccoon then was required to pay for the water delivered to it according to the following rates:

| QUANTITY CHARGES | | | RATE [9] |
|---|---|---|---|
| First | 6,000 | gals. per quarter | $6.00 |
| Next | 12,000 | gals. per quarter | .80 per 1,000 |
| Next | 42,000 | gals. per quarter | .70 per 1,000 |
| Next | 90,000 | gals. per quarter | .60 per 1,000 |
| Next | 240,000 | gals. per quarter | .50 per 1,000 |
| All over | 300,000 | gals. per quarter | .43 per 1,000 |

In 1985 Aliquippa adopted uniform rates for its customers in its service area inside the City of Aliquippa served through a single water meter by establishing a multi-minimum rate for dwelling units, apartment units and other multiple occupied buildings. Thereafter, Aliquippa adopted, effective January 1, 1986, a schedule of uniform rates for water it provides to its customers residing *outside* the limits of the City of Aliquippa by establishing multi-minimum water rates for dwellings, apartment units and other multiple occupied buildings served by one water meter. There was a minimum quarterly charge depending on the size of the meter; the meter sizes ranged from 5/8", the smallest, with a minimum charge of $10.91 for the first 6000 gallons to the largest meter size of 10" with a minimum quarterly charge of $2792.96 for the first 6000 gallons.[10]

After the first 6000 gallon minimum, the rates were the same for all users of water regardless of the size of the meter, as follows:

Next 12000 gallons 1.460/1000

Next 42000 gallons 1.270/1000

All over 60,000 gallons 1.090/1000

Where two or more dwelling units are served by one water meter, the above charges shall apply to each dwelling unit.[11]

9. The rates were increased from time to time up through December 31, 1985.

10. The meter size measuring the water delivered to Raccoon by Aliquippa was 8" with a minimum quarterly charge of $1788.88.

11. Raccoon Township is primarily a residential community.

Each dwelling unit in a double house, in a row of connecting houses, housing project or development, building, or in an apartment shall be charged as a separate entity. Any room, group of rooms, house trailer, enclosure, etc., occupied or intended for occupancy as separate living quarters by a family or other group of persons living together or by persons living alone shall be classified as a dwelling unit.

Where conditions make it difficult to install separate water meters for each dwelling unit, or where the property owner refuses to arrange his piping so that separate meters can be installed a single meter will be installed, if not already installed, and a minimum charge will be made for each dwelling unit supplied through the single meter as listed for the size meter that would be required to serve each individual dwelling unit. The water registered by the meter will be divided by the number of dwelling units, and any excess water above the several minimum allowances will be charged pro-rata to the several users of the dwelling units.

The total charge for each dwelling unit is the minimum charge plus commodity charges for the average consumption in excess of the minimum gallon allowance. The total charge for the apartment complex, or housing project or development, is the charge for the individual dwelling unit multiplied by the number of dwelling units.[12]

(See Schedule of Rates in Resolution No. 85–5 of 1985 in original record.)

There is no dispute between the parties that Raccoon is in Raccoon Township, both of which are separate entities from Aliquippa and outside Aliquippa's service area and are not members of the Aliquippa Water Authority. Thus, the applicable section of the Act is 4 B(p) as was explicated by this Court in *Township of Aston v. Southwest Delaware County Municipal Authority,* 112 Pa.Commonwealth Ct. 434, 438–39, 535 A.2d 725, 728 (1988), wherein we held:

12. There was a provision for abatement where there were vacancies.

While Section 4 B(h) speaks of fixing reasonable and uniform rates "in the area served by [a municipality authority's] facilities," there is no such limitation where an authority contracts with another, presumably outside that area. In the case of a contract under Section 4 B(p), a municipal authority is given the power to fix the rates to be paid for its services, without the statutory limitation that they be "reasonable and uniform." The discrepancy is not illogical when the difference between the two situations is examined. In the first case, under Section 4 B(h), a municipal authority is granted the exclusive authority to set rates for its services. The recipient of these services has no input into the ratemaking process. It is therefore protected by the provision requiring the rates to be reasonable and uniform and subject to judicial review. Such is not the case when two municipal bodies contract for services, as under Section 4 B(p). That section allows a municipal authority to fix the rate for its services, but that rate, of course, will be the subject of negotiation before a contract is concluded. There is nothing in the statute to prevent the inclusion of a clause providing for periodic rate increases and, conversely, nothing to prohibit setting a maximum rate....

■ Aliquippa's authority to sell water to entities outside its service area and the prices to charge therefore has its genesis in section 4 B(p). The terms for the sale of water and the prices to be charged therefor are, under said section, to be fixed by contract. In this case the parties in 1973 initially fixed the rates Raccoon was to pay for water delivered to its service area. Significantly, the parties also provided in paragraph * 5 of their agreement for modification of the 1973 rates by Aliquippa at "anytime", subject only to (a) the modification is recommended by the consulting engineer, (b) the recommendation of the consulting engineer is to be based on the total cost of Aliquippa's operations, and (c) Aliquippa must apply rate modifications equally to all like customers purchasing water from it. This authorized Aliquippa to modify rates without either

negotiation with, or consultation with, or agreement by, Raccoon; that Aliquippa had this power, subject only to the above conditions, is evidenced by the last sentence of paragraph * 5, which states that, "Other provisions of this contract may be modified or altered by mutual agreement of the parties to this contract."

Where the rights and duties of the parties arise out of contract pursuant to Section 4 B(p) of the Act, the burden is on the challenging party (Raccoon) to prove noncompliance with the terms of the contract or Section 4 B(p), or both.[13] Raccoon does not deny that the multi-minimum rate adopted by Aliquippa pursuant to 85–5 was recommended by Aliquippa's consulting engineer. Raccoon contests the application of the multi-minimum rate to it on the basis that the consulting engineer did not properly apply the commodity demand rate method for determination of Aliquippa's total cost of operations to sustain his recommendation, and lastly, since rate modifications must apply equally to all *like consumers* purchasing water from Aliquippa, it, Raccoon, is not *like* the consumers of water inside Aliquippa's service area who are also subject to the same multi-minimum rate.

Raccoon argues that since it, and not Aliquippa, undertakes to perform those services to water users in its service area, delineated as customer related costs, i.e. meter reading, billing, accounting, office space and general administration, these items do not contribute to the customer related costs of Aliquippa. Likewise, that commodity demand costs, which relate to those costs of providing facilities to meet "peak rates of use" are not a factor in contributing to "peak" periods in Raccoon's area of service since most of its users are residential customers and Raccoon has a 300,000 gallon storage tank which bears the peak demand of its

13. Our scope of review of trial courts' decisions involving either Section 4 B(h) or 4 B(p) of the Act is limited to determining whether the factual findings are supported by substantial evidence and whether the law was properly applied to the facts. *Municipal Authority of the City of Monongahela v. Carroll Township Authority,* 123 Pa.Commonwealth Ct. 615, 555 A.2d 264 (1989).

users and the only demand made on Aliquippa's system by Raccoon is the demand associated with the booster pump utilized by Raccoon to fill up its storage tank. Whether the foregoing contention of Raccoon is correct or not, is of no consequence, since one of the conditions of the contract, in paragraph * 5, is that the recommendation of the consulting engineer "is based on the total costs of the Sellers operations," not on the costs of Raccoon's operations.[14] Raccoon presented no evidence to demonstrate that the total costs of Aliquippa's operations did not provide the basis for the engineer's recommendation.

Furthermore, the trial court addressed the issue of Aliquippa's use of the commodity demand method to establish rates based on total cost, and properly disposed of Raccoon's contentions, as follows:

> In determining the reasonableness of a rate system, we must look to the value of the service rendered either as actually consumed or as readily available for use. *Ridgway Township Municipal Authority v. Exotic Metals, Inc.*, 88 Pa.Cmwlth 637 [491 A.2d 311] (1985); *Patton–Ferguson, [Joint Authority v. Hawbaker*, 14 Pa.Cmwlth 402, 322 A.2d 783 (1974)] supra.
>
> The value of the service can be and often is established by use of the "Commodity Demand" method of analyzing the cost to produce water, which logically forms the basis for setting a rate to be charged. Robert Softcheck, consulting engineer, who appeared as an expert witness for Aliquippa, explained in depth this method, which is one of several recognized by the American Water Works

---

**14.** In *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659 (1981), the Supreme Court said:

"[T]his Court long ago emphasized that '[t]he parties [have] the right to make their own contract, and it is not the function of this Court to re-write it, or to give it a construction in conflict with ... the accepted and plain meaning of the language used.' " (Citations omitted.) " 'It is not the province of the court to alter a contract by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves, without regard to its wisdom or folly.' ..." (Citation omitted.)

Association. The "Commodity Demand" method analyzes three particular cost components: The first is the "Demand Cost" which includes the cost of providing facilities which are able to meet the peak demands on the system. The second is the "Commodity Cost" which includes those expenses associated with pumping the water, purification and other laboratory costs. The third is "Customer Related Cost" which includes those expenses incurred in meter reading, billing, accounting and office and administrative expenses.

In his calculations using the Commodity Demand Method for Aliquippa, Mr. Softcheck determined that the average cost to produce 1,000 gallons of water in 1986 was $1.99. While this Court recognizes that the cost to produce does not necessarily equal the "value of services rendered", realistically speaking, such cost must form the basis for any rate structure imposed.

The rate schedule set forth in Resolution 85–5, which was effective January 1, 1986, specified a minimum charge of $10.91 for the first 6,000 gallons, or about $1.82 per 1,000 gallons. The charges per 1,000 gallons for usage above the first 6,000 gallons varied between $1.09 and $1.46 depending upon consumption. Comparing these charges to Mr. Softcheck's calculation that it cost an average of $1.99 in 1986 to produce 1,000 gallons of water and Maurice Moore's calculation, on behalf of Raccoon, that it cost $1.58 per 1,000 gallons, it is apparent that the rate structure is reasonable in relation to the cost to produce water available to Raccoon.

In addition, the factors which Aliquippa used in considering implementation of a "multiple [sic] minimum" rate structure are legitimate factors, including increased operating costs, a reduction in revenue, and the necessity for capital improvements; ...

Raccoon next argues that it is an independent municipal authority, independent of the Township of Raccoon and independent of Aliquippa as to its service and geographic area. For further emphasis, it adds that Raccoon is neither

the owner of a dwelling unit in a double house, nor of a row of connecting houses, nor of a housing project or development, nor of a housing building, nor of house trailers, nor of separate living quarters.

Raccoon surmises, "What it might be is a 'Consumer' ... in that it has a contract with Aliquippa, but, as a consumer, it has not contracted for water service for one family or an institution or a housing development or one premises owned or tenanted by it. By contract it might be construed to be a business entity or a commercial entity or an industrial entity which receives water from Aliquippa by contract at an 8″ meter leading to a water storage tank and pumped to said water storage tank by facilities owned and maintained by Raccoon."

Raccoon further points out that Aliquippa did impose multi-munimum rates upon the Housing Authority of Beaver County and a number of other publicly and privately held apartment complexes within its geographic service area and that it is obvious that Raccoon is not a like consumer when compared to those entities.

Raccoon then concludes it:

[I]s more 'like' a commercial customer in that it remanufacturers the water by treating it with additional chemicals, repackages it by way of its pumps and pressurization system, stores it by way of a warehouse, i.e. its storage facilities and transports it through its own system of transportation, i.e. its water lines to its own retail outlets, i.e. its metered customers at rates and charges determined by it.

Raccoon further states Aliquippa has only one customer outside its service area, and that customer, Raccoon Township Water Authority, is unlike any other of Aliquippa's customers.

Aliquippa's reply to Raccoon's contention is that it "conveniently omits that at the time the contract was entered into and thereafter, it was not unlike Hall Water Company or Division Street Company (both under contract to pur-

chase water from Aliquippa), who also existed outside Aliquippa's city limits and who did resell the water and who did pay for their own expenses for service line distribution, billing, maintenance, etc." Aliquippa concludes that "like customers" as used in the 1973 contract means those customers who purchase water from Aliquippa pursuant to contract under Section 4 B(p) of the Act.

The issue then resolves into the meaning of the phrase "like consumers" in the conditions in paragraph * 5, which states that Aliquippa "must apply rate modifications equally to all like consumers purchasing water from" it.

 In the construction of any contract, if there is any doubt as to the meaning of a term of the contract, such term should receive a reasonable construction and one that will accord with the intention of the parties and in order to ascertain that intention the court must look at the circumstances under which the contract was made, the situation of the parties, the objects they have in mind and the nature of the subject matter of the contract. *Sigal v. Manufacturers Light and Heat Co.*, 450 Pa. 228, 299 A.2d 646 (1973); *Stewart v. Chernicky*, 439 Pa. 43, 266 A.2d 259 (1970); *United Refining Co. v. Jenkins*, 410 Pa. 126, 189 A.2d 574 (1963); *Percy A. Brown & Co. v. Raub*, 357 Pa. 271, 54 A.2d 35 (1947).

The record establishes that both Raccoon and Aliquippa are independent municipal authorities with each having different service areas. *Aston, supra*, clearly establishes that the relationship vis-a-vis each other is governed not by Section 4 B(h) of the Act, but by 4 B(p), and the contract negotiated between them pursuant thereto. Both Raccoon and Aliquippa knew that their rights and duties were to be established by contract and not by Section 4 B(h). Both knew that the customers of Aliquippa within its service area had no choice to obtain water except from Aliquippa and at the rates exclusively fixed by Aliquippa. Both knew that Raccoon had a choice of establishing facilities to produce its own water or purchase water from another source. Unlike the customer within Aliquippa's service area, Raccoon was

under no obligation to contract to buy water from Aliquippa. Raccoon knew, or should have known, Section 4 B(p) authorized Aliquippa to sell water to other entities named therein which included a water authority, such as itself, at rates to be fixed by contract. Raccoon knew or should have known that in selling water to another water authority Aliquippa could negotiate for rates different than those rates applicable to its customers inside of its service area.

 Applying the foregoing circumstances to the principles announced by our Supreme Court in *Sigal, Stewart, United Refining* and *Percy A. Brown & Co., supra,* it admits of no argument that the phrase "like customers" as used in the context of paragraph * 5 means another customer outside of Aliquippa's service area to whom Aliquippa sold water pursuant to contracts authorized under Section 4 B(p) and not to Aliquippa's customers within its service area.

This conclusion is reinforced by the fact that prior to January 1, 1986, the record establishes that Aliquippa was selling water to Hall and Division, each being a water authority with their own distribution systems and each had substantially the same expense that Raccoon had. The resolution adopting the multi-minimum rate by Aliquippa states that it does "hereby fix and adopt the schedule of uniform rates for water ... services it provides to its customers residing outside the limits of the Borough of Aliquippa and does hereby establish multi-minimum water ... rates...." Neither in the adoption clause of Section 1 of Resolution 85–5 is Raccoon named nor is Hall or Division named. The adoption of the multi-minimum rate was directed to customers residing outside the limits of Aliquippa's service area. The customers of Aliquippa outside of its service area under the Act, Section 4 B could only be those entities listed in sub-paragraph (p) and not customers of Aliquippa under Section 4 B(h) of the Act.

Raccoon at trial, and in its brief to us, studiously avoids any mention of Hall and Division. Significantly, although it devotes many words in an attempt to demonstrate how

Aliquippa's customers within Aliquippa's service area are unlike it, Raccoon made no effort at trial to demonstrate that it was unlike Hall and/or Division; of more importance however is that Raccoon presented no evidence that the multi-minimum rate applied to it pursuant to Resolution 85–5 was not the same rate applied to Hall and/or Division.

Raccoon, having failed to establish its burden of proving a breach of its 1973 contract with Aliquippa or any violation of the Act, specifically Section 4 B(p), the order of the trial court will be affirmed.

## ORDER

AND NOW, this 26th day of September, 1991, the order of the trial court of June 18, 1990 denying Plaintiff's motion for post-trial relief from the Judgment of December 1, 1989 is affirmed.

PELLEGRINI, Judge, dissenting.

I respectfully dissent. The majority, by holding that a water purchasing municipal customer who maintains its own distribution and storage system, and bills and services its own customers, is "like" a multiple dwelling unit customer within the providing municipality, is at variance both with the intent of the parties and common parlance within the industry.

On February 19, 1973, the Borough of Aliquippa (Aliquippa), as Seller, and the Township of Raccoon (Raccoon), as Purchaser, entered into a water purchase contract (Contract). (58–61).[1] The Contract provided in relevant part that:

B. The Purchaser Agrees:

1. (Rates and Payment Due) To pay the Seller, not later than the 20th day of each month, for water, delivered in accordance with the following schedule of rates:

1. The numbers in the parenthesis refer to the Reproduced Record.

According to the *Municipal Water Authority's Standard Adopted Rates*, a copy of which is attached hereto and made a part of this contract.

(58–59) (emphasis added).

The Contract also contained a clause which allowed Aliquippa to modify the schedule of rates from time to time:

5. (Modification of Contract) That the provisions of the contract pertaining to Schedule of Rates to be paid by the Purchaser for water *are subject to modification by the Seller at any time.* It is noted that the Seller is required, in accordance with the terms of its Trust Indenture, to modify rates periodically as recommended by its consulting engineer, which recommendation is based on the total cost of the Seller's operations. It is further noted that the Seller, in accordance with its Trust Indenture, *must apply rate modifications equally to all like consumers purchasing water from the Seller.* Other provisions of this contract may be modified or altered by mutual agreement of the parties to the said contract.

(59–60) (emphasis added).

From time to time, Aliquippa modified its Standard Adopted Rates pursuant to the language of the Contract. Raccoon paid in accordance with those rate schedules. On June 4, 1984, upon recommendation of Aliquippa's then-consulting engineer, Maurice Moore, Aliquippa adopted Resolution No. 84–1 of 1984. (198–202). Resolution No. 84–1 for the first time established a multi-minimum rate structure which fixed a minimum charge for water services to each dwelling unit in apartment houses and other multiple occupied buildings. Each dwelling unit was then charged a minimum, even though it is served water through a single master meter. (198–202). Previously, master meter consumers within Aliquippa were charged a single minimum, regardless of the number of dwelling units served through the master meter.

On December 22, 1985, Aliquippa adopted Resolution No. 85–1, which extended the multi-minimum rate structure established by Resolution No. 84–1 to consumers outside

the limits of Aliquippa, including Raccoon. (63–67). Aliquippa then began charging Raccoon as a multiple dwelling consumer, imposing a 6,000 gallon minimum fee for each and every dwelling unit that Raccoon served.[2]

Due to the change in the way its rates were calculated under these Resolutions, Raccoon's rates dramatically increased, because it must now pay a relatively high "minimum" charge based on the number of consumers within its service area instead of the single "minimum" charged prior to Resolution No. 85–1. Raccoon, instead of paying a "minimum" of $10.91 for the first 6,000 gallons of water, and following the rate schedule for all gallons over 6,000, must now pay the "minimum" amount for each dwelling unit in Raccoon before it would reach the next tier in the rate schedule. (139–140). Each subsequent tier in the rate schedule would also be increased by the number of dwelling units in Raccoon.

Unlike the majority, I believe Aliquippa violated the Contract, because it failed to apply the rate modifications "equally to all *like consumers* purchasing water" from Aliquippa. Resolution No. 85–1 violates the Contract by changing Raccoon to a consumer "like" an apartment building, co-op or duplex with one master meter which, unlike Raccoon, utilize the services provided by Aliquippa.

In the typical case where the municipality sets the water rates for the consumers within its own borders, the municipality is subject to Section 4 B(h) of the Municipal Authorities Act of 1945 (MAA).[3] Section 4 B(h) requires that the municipalities' rates must be "reasonable and uniform." 53

---

**2.** The new rates established by Resolution Nos. 84–1 and 85–1 were as follows:

| Metered Gallons/Quarter | Water Rate/Quarter |
| --- | --- |
| First 6,000 Gallons | $10.91/minimum |
| Next 12,000 Gallons | 1.460/1,000 |
| Next 42,000 Gallons | 1.270/1,000 |
| All over 60,000 Gallons | $1.090/1,000 |

(65, 200).

**3.** Act of May 2, 1945, P.L. 382, *as amended,* 53 P.S. § 306 B(h).

P.S. § 306 B(h). Because of the "reasonable and uniform" standards, rates must be reasonably proportional to the value of the service rendered. *Hamilton's Appeal*, 340 Pa. 17, 16 A.2d 32 (1940); *Kennedy Township v. Ohio Valley General*, 129 Pa.Commonwealth Ct. 494, 566 A.2d 348 (1989). That includes service as actually consumed or as readily available for use. *Life Services, Inc. v. Chalfont–New Britain Township Joint Sewage Authority*, 107 Pa. Cmwlth. 484, 528 A.2d 1038 (1987). *Ridgway Township v. Exotic Metals*, 88 Pa.Cmwlth. 637, 491 A.2d 311 (1985). Moreover, the person or entity charged must obtain "some" benefit from the service. *Kennedy Township*, 129 Pa.Commonwealth Ct. at 499, 566 A.2d at 351. Services readily available for use would include water available for fire protection. *See Ridgway Township.*

However, as in the present case, Section 4 B(p) of the MAA gives a municipality the power to enter into a contract to supply water to another municipality and to fix the amount to be paid, 53 P.S. § 306 B(p), without the statutory limitation under § 4 B(h) of the MAA that they be "reasonable and uniform." *Municipal Authority of the City of Monongahela v. Carroll Township Authority*, 123 Pa.Commonwealth Ct. 615, 555 A.2d 264, *petition for allowance of appeal denied*, 524 Pa. 599, 568 A.2d 1249 (1989). As between two municipalities, the rates charged and the terms of any rate increase are left solely to the provisions of the Contract between them. *See Tamaqua Borough v. Rush Township Sewer Authority*, 85 Pa.Commonwealth Ct. 421, 482 A.2d 1167 (1984).

To determine the import of the language in the Contract that Aliquippa "must apply rate modifications equally to all like consumers," and whether Aliquippa's modification of the rate schedule as applied to Raccoon violates this language, we must determine the intent of the parties when they entered the contract. The principles applicable to interpreting the language of a contract are well settled. As stated by our Supreme Court in *R.F. Felte, Inc. v. White*, 451 Pa. 137, 143–144, 302 A.2d 347, 351 (1973):

When interpreting a contract, the intention of the parties must be determined, and in ascertaining that intention, effect must be given to all the provisions of the contract. . . . In a written contract, the intent of the parties is the writing itself, and when the words are clear and unambiguous, the intent is to be determined only from the express language of the agreement. (Citations omitted.)

*See also Latrobe Municipal Authority v. Youngstown Borough Municipal Authority,* 72 Pa.Commonwealth Ct. 84, 456 A.2d 234 (1983).

Furthermore, in interpreting the meaning of a certain provision in the contract, it is important to remember that "every agreement is made and [should] be construed with due regard to the known characteristics of enterprises in which they are engaged, and that the language used in a contract will be construed according to its purport in that particular enterprise." *Latrobe Municipal Authority,* 72 Pa.Commonwealth Ct. at 91, 456 A.2d at 238.

By including in the Contract the provision that any rate modifications were to apply "equally to all like consumers," it was the intent of the parties that those rate modifications as applied to Raccoon were to conform to the "reasonable and uniform" standard as applied to consumers within a municipality. A "uniform" rate is one applied "equally to all like consumers." The effect of this language was to insure that any rate modification will be applied uniformly to Raccoon in the same way as it is to a "like" consumer. The intent was not, as Aliquippa contends, to insure that the rate schedule is applied equally to *all* of its consumers, both within and without Aliquippa. Thus, the question in dispute is what consumer is "like" Raccoon.

The principle that the rate charged must be reasonably proportional to the service readily available is equally applicable here to determine whether Raccoon is "like" a multiple dwelling consumer. The cost of the service rendered or readily available for use by the multiple dwelling consumer in Aliquippa includes Aliquippa's expense in providing and

maintaining the service lines to each dwelling unit, providing and maintaining the service lines to fire hydrants and other outlets for fire protection, reading meters and billing consumers.[4]

Aliquippa does not incur consumer-related costs, since Raccoon maintains its own service lines and reads and bills its own metered customers, with Aliquippa merely reading and billing the master meter. (129–130, 178, 940–944). Aliquippa also incurs less demand-related costs, since Raccoon has its own water storage tank which draws a steady supply of water like a single large commercial consumer as opposed to hundreds of residential ones. (129–130, 178, 985–995).[5] Because it provides services to its consumers that Aliquippa provides within its boundaries, Raccoon must charge its water consumers higher rates than Aliquippa charges its own residents within its borders in order to pay for these services. (156, 168). In essence, Raccoon residents are paying twice for the same service. As such, Raccoon is not a consumer "like" the multiple dwelling consumer in Aliquippa.

The majority's reliance that two other municipal authorities, Hall and Division, have not challenged the rate is

4. Raccoon maintains its own water storage facility, pump station, chemical treatment facility, twenty miles of water line and it employs its own maintenance and office staff which read the individual meters and bill each of the consumers. (55–57, 187, 540, 835, 934–935, 940–944).

5. Aliquippa imprecisely uses the Commodity–Demand Rate Analysis Method (CDRAM) to modify its rates, since it factors in the value of Aliquippa's services to justify its charges, even though those services are not provided to Raccoon. CDRAM is one of three cost-of-service analysis methods recognized by the American Water Works Association's Water Rates Manual. CDRAM classifies the costs of operating a water utility into three types: consumer-related costs; demand-related costs and commodity-related costs. Customer-related costs are associated with servicing consumers irrespective of the amount of water used. They include meter reading, billing, accounting, office space and a portion of the general administrative costs. Demand-related costs are associated with providing facilities to meet the peak rates of use placed on the system by the consumers. These costs include capital charges and operating and maintenance costs. Commodity-related costs are costs that tend to vary with the quantity of water produced and sold. (129–132).

misplaced. Because each of their rates is also set by negotiated contract between each of them and Aliquippa, by very definition, they are not "like" other consumers within Aliquippa. To adopt the majority reason, each time each of them negotiated a new contract, those rates would be applied to Raccoon. Additionally, "like" consumer is used in a utility contract as one who uses "like" volume, not who is a "like" entity.

What Raccoon is "like" is a single consumer in Aliquippa. The services available from Aliquippa are only readily available up to Raccoon's master meter, not beyond. Aliquippa maintains the service lines and fire protection lines only up to the meter. Aliquippa reads only that one meter and sends Raccoon only one bill. What "like" meant in the Contract was for it to be charged the same rates as any other large volume consumer who had one meter and who consumed the same amount of water.

Therefore, I would hold that Aliquippa's Resolution No. 85–5 violates the Contract, because it treats Raccoon, a consumer outside Aliquippa, like a multiple dwelling consumer inside Aliquippa, when, in essence, it is "like" a single consumer. Under the language of the Contract, Raccoon should be billed as a single consumer. I would reverse the decision of the trial court.