**HIGHRIDGE WATER AUTHORITY,**
**Appellant,**

v.

**LOWER INDIANA COUNTY MUNICI-PAL AUTHORITY and Central Indiana County Water Authority.**

Commonwealth Court of Pennsylvania.

Argued Nov. 22, 1996.
Decided Feb. 20, 1997.

Joseph M. Ramirez, Pittsburgh, for appellant.

Michael J. Supinka, Indiana, for appellees.

Before McGINLEY and PELLEGRINI, JJ., and RODGERS, Senior Judge.

RODGERS, Senior Judge.

Highridge Water Authority (Highridge) appeals from the order of the Court of Common Pleas of Indiana County (trial court) which dismissed Highridge's complaint and denied its request for permanent injunction. We affirm.

Highridge was incorporated in 1989 and completed acquisition of its predecessor, Central Pennsylvania Water Supply Company, in 1991. Since the 1950's, Highridge or its predecessor has been selling bulk water to the Lower Indiana County Municipal Authority (LICMA) for redistribution and sale to individual customers within LICMA's service area. Since approximately 1956, Highridge has been the exclusive supplier of non-emergency water to LICMA. A 1984 contract, with a term of 25 years, requires Highridge to supply LICMA with up to nine million gallons of water per month.[1]

---

1. Section 4B(p) of the Municipality Authorities Act of 1945 (Act), Act of May 2, 1945, P.L. 382, *as amended*, 53 P.S. § 306B(p), provides municipal authorities the power to enter into contracts to supply water and other services to municipalities that are not members of the authority, or to

Since 1974, LICMA also has purchased bulk water from Central Indiana County Water Authority (Central). The 1974 contract between LICMA and Central provided LICMA the right to purchase a gross amount not to exceed ten million gallons of water per month and contained a minimum purchase requirement of one million gallons per month. Historically, these purchases were made only in cases of emergency for extraordinary requirements, such as combatting fire.

In 1993, after Highridge increased its rates, LICMA's board of directors voted to change its primary supplier of water from Highridge to Central; LICMA offered to continue purchasing from Highridge if Highridge would roll back the rate increase, but Highridge declined to do so.

Highridge commenced this action by filing a complaint and motion for preliminary injunction against LICMA and Central, contending that the sale of non-emergency water by Central would violate the non-competition clause of Section 4A(b)(2) of the Act, 53 P.S. § 306A(b)(2). The trial court granted the preliminary injunction in order to preserve the status quo pending litigation.

The Department of Environmental Resources (DER, now known as the Department of Environmental Protection) filed a petition to intervene, as LICMA had not obtained the necessary water allocation permit for the purchase of water from Central. The trial court stayed all proceedings pending regulatory action on LICMA's permit request and granted DER's petition to intervene.

In 1995, LICMA obtained permits from DER which provided, inter alia, that LICMA could purchase up to 57,000 gallons of water per day from Central, in addition to a maximum of 300,000 gallons per day from Highridge.[2] The permits also authorized LICMA to purchase up to 30,000 gallons per day from the Blairsville Municipal Authority.

Following a hearing on Highridge's request for permanent relief, the trial court concluded that LICMA's purchase of non-emergency water from Central would not violate the non-competition clause contained in Section 4A(b)(2) of the Act because 1) Highridge had served only as LICMA's primary water supplier and would continue to do so, regardless of increased purchases from Central and 2) LICMA was not within Highridge's service area, and its only obligation to buy from Highridge stemmed from the contract between the two parties. By order dated August 9, 1995, the trial court denied the request for a permanent injunction, dismissed Highridge's complaint, and vacated its previous order granting a preliminary injunction. Highridge filed a timely motion for post-trial relief which the trial court denied by order dated March 19, 1996.

On appeal to this Court, Highridge first argues that the trial court erred in concluding that the increase in sales of bulk water by Central to LICMA does not violate Section 4A(b)(2) of the Act. Section 4A(b)(2) of the Act states as follows:

> The purpose and intent of this act being to benefit the people of the Commonwealth by, among other things, increasing their commerce, health, safety and prosperity, and not to unnecessarily burden or interfere with existing business by the establishment of competitive enterprises, none of the powers granted by this act shall be exercised in the construction, financing, improvement, maintenance, extension or operation of any project or projects or providing financing for insurance reserves which in whole or in part shall duplicate or compete with existing enterprises serving substantially the same purposes.

53 P.S. § 306A(b)(2).

Highridge contends that the words "in whole or in part" demonstrate a legislative intent to eliminate all duplication of services by municipal authorities. Therefore, Highridge argues, the trial court erred by relying on the fact that Highridge would continue

the Commonwealth of Pennsylvania, municipalities, school districts, persons or authorities, and fix the amount to be paid therefor.

2. This is consistent with Highridge's contractual obligation to supply LICMA with up to nine million gallons of water per month.

to be LICMA's primary supplier of water.[3] Highridge maintains that it has acquired the right to remain LICMA's *sole* supplier of non-emergency water by virtue of its having been LICMA's sole supplier for over forty years.

In support of its argument, Highridge relies on *Bristol Township Water Authority v. Lower Bucks County Joint Municipal Authority*, 130 Pa.Cmwlth. 240, 567 A.2d 1110 (1989) (*Bristol Township*). In that case, Lower Bucks County Joint Municipal Authority (Lower Bucks Authority) was incorporated in 1952 by ordinances of Bristol Township and Tullytown Borough to serve those municipalities and "for such other territory as it may be authorized to serve." *Id.* 567 A.2d at 1114 (citation omitted). In 1961, Lower Bucks Authority expanded into the disputed areas and operated and maintained the water lines in those areas for over 25 years. Subsequently, in 1986, Bristol Township Water Authority (BTWA) was incorporated and sought to extend its water service into areas already served by Lower Bucks Authority. Lower Bucks Authority filed a complaint in equity asserting that BTWA would be duplicating water service in the disputed areas in violation of Section 4A(b)(2) of the Act. The court of common pleas enjoined BTWA from providing water to the disputed areas, and this court affirmed that order on appeal.

One of the issues BTWA raised on appeal was whether Lower Bucks Authority was required to prove ownership of the water lines serving the areas in question in order to invoke the protection of the Act. The *Bristol Township* court noted that the Act applies to authorities which maintain and operate water distribution systems, as well as to those authorities which own their own waterworks.[4] The *Bristol Township* court concluded that the fact that Lower Bucks Authority had maintained and operated the water distribution system in the disputed areas since 1961 was sufficient to trigger the Act's application,

stating that the common pleas court's decision (that the Act applied) "was based upon the fact of Lower Bucks' service for more than 25 years." *Id.* at 1112.

Highridge quotes this language and argues that, similarly, the actual fact of Highridge's decades-long practice of supplying all of LICMA's non-emergency water needs is sufficient to establish a right to have its position protected by Section 4A(b)(2) of the Act. However, the decision in *Bristol Township* was not based merely on the fact that service was being provided; Lower Bucks Authority was authorized to provide water to the disputed areas by virtue of its enabling ordinance, and the disputed area became integrated into Lower Bucks Authority's service area by authority of an easement. *See id.* at 1114.

As the trial court observed, Highridge does not assert that *any* sale of water by Central to LICMA violates the Act, only the sale of non-emergency water. Highridge's argument, essentially, is that an increase in the volume of otherwise lawful sales by Central renders the same activity unlawful. However, the existing connection between LICMA and Central has served the purpose of ensuring that all of LICMA's water needs were satisfied, as the connection between LICMA and Highridge has not supplied those needs in their entirety. Thus, the on-going sale of water by Central to LICMA has complemented the sales made by Highridge, so that the "serving the substantially the same purpose" requirement of Section 4A(b)(2) is not met.

In addition, Highridge does not argue that the increase in water sales by Central will require capital expenditures, i.e., that they will require the construction, financing, improvement, maintenance, etc. of a "project" or "projects" by either Central or LICMA. Accordingly, Highridge does not assert that Central is performing an activity which is specifically prohibited by the Act.

---

**3.** While the 57,000 gallons per day limit in LICMA's permit prevents Highridge from being entirely replaced as a supplier, Highridge points out that this amount represents between 19% and 26% of the quantity of water Highridge had been selling to LICMA.

**4.** Section 4A(a)(10) of the Act, 53 P.S. § 306A(a)(10).

■ Highridge also argues that the issue of whether LICMA is part of Highridge's service area is not relevant to the question of illegal competition between municipal authorities. The term "service area" refers to a discrete area, typically identified by a municipal authority's enabling legislation, within which the authority has the exclusive power to set rates.[5]

Highridge notes that the term "service area" is not included in Section 306A(b)(2). However, the courts have, in fact, utilized that concept to determine what rights are afforded protection under the Act.

In *Lower Bucks County Joint Municipal Authority v. Bristol Township Water Authority*, 137 Pa.Cmwlth. 415, 586 A.2d 512 (1991) (*Lower Bucks*), the court cited its holding in *Bristol Township*, stating that "where water [is] actually furnished by an entity *in compliance with its enabling legislation* that separate right to furnish will be protected by the Act." *Lower Bucks*, 586 A.2d at 516 (emphasis added) (citation omitted). The right to furnish water which was

afforded protection under the Act in *Bristol Township* was a right acquired under the provisions of the authority's enabling legislation, which set forth the specific territory that the authority was created to serve.

■ As a municipal authority organized pursuant to the Act, Highridge has only such power and authority as provided by its enabling legislation. *In Re Acquisition of Water System in White Oak Borough*, 372 Pa. 424, 93 A.2d 437 (1953); *Fisher v. Southeastern Pennsylvania Transportation Authority*, 60 Pa.Cmwlth. 269, 431 A.2d 394 (1981). Highridge does not assert that its enabling legislation provides it the authority to sell water to LICMA. Instead, Highridge seeks to protect its right to furnish water to an entity outside its service area, a right Highridge acquired under the terms of its contract with LICMA.

In *Raccoon* and *Aston*, the court held that where the sale of water by one municipal authority to another was authorized by a contract between the parties, rate disputes

---

5. The phrase "service area" is included in Section 4B(h) of the Act, 53 P.S. § 306B(h), which grants an authority the exclusive power to set rates for services provided within its service area, with the limitation that those rates be reasonable and uniform. The limitation contained in Section 4B(h) does not apply where the authority contracts with another. *Township of Raccoon v. Municipal Water Authority of the Borough of Aliquippa*, 142 Pa.Cmwlth. 508, 597 A.2d 757 (1991), *Township of Aston v. Southwest Delaware County Municipal Authority*, 112 Pa. Cmwlth. 434, 535 A.2d 725 (1988).

In *Aston*, the defendant authority (Southwest) entered into a contract with another authority (Middletown) which set a fixed rate and did not provide for any increase over the life of the contract. Southwest subsequently adopted resolutions increasing Middletown's rates, but Middletown refused to pay the increase on the grounds that the rate was fixed by the contract. Aston Township, a participating municipality of Southwest, filed a complaint seeking to have the contract voided so as to allow Southwest to establish a reasonable and uniform rate for all users.

Aston Township argued that the contract was violative of Southwest's statutory duty under Section 4B(h) to fix reasonable and uniform rates. Aston Township did not argue that the contract was illegal *ab initio*, but argued that it became illegal when the rate agreed to became disproportionate to the amount paid by other Southwest facility users for the same service.

The *Aston* court concluded that Section 4B(p) of the Act provided legal authority for the Southwest–Middletown contract and, as the parties were bound by its terms, Southwest had waived the right to alter its rate for the life of the contract.

In *Raccoon*, the Raccoon Township Water Authority (Raccoon) entered into a contract to purchase water from the Municipal Water Authority of the Borough of Aliquippa (Aliquippa). The terms of the contract provided that the rates were subject to modification by the seller at any time. After Aliquippa adopted a resolution which had the effect of increasing Raccoon's rates, Raccoon filed a declaratory judgment action seeking, inter alia, to have the court declare the resolution and rate increase invalid.

The *Raccoon* court upheld the rate increase as being consistent with the terms of the contract. The court noted that, because Raccoon was outside of Aliquippa's service area and not a member of that authority, the applicable section of the Act was Section 4B(p). The court concluded that, as Aliquippa's authority to sell water to entities outside its service area has its genesis in Section 4B(p), "[t]he terms for the sale of water and the prices to be charged therefor are, under said section, to be fixed by contract." *Id.* 597 A.2d at 762. The *Raccoon* court then analyzed the rights and duties of the parties which arose out of the contract.

between the parties were governed by Section 4B(p) of the Act, rather than Section 4B(h). Although the issues in *Raccoon* and *Aston* involved rate disputes, we relied on those decisions in *Beaver Falls Municipal Authority v. Municipal Authority of the Borough of Conway*, 689 A.2d 379, (Pa. Cmwlth.1996) (*Beaver Falls*), a case which also involved the application of Section 4A(b)(2). Applying the reasoning set forth in *Raccoon* and *Aston,* we concluded in *Beaver Falls* that where, as here, the authority to sell water to entities outside a municipal authority's service area stems from Section 4B(p) of the Act, the terms for the sale of water are to be fixed by contract.

In accord with our decision in *Beaver Falls,* we conclude that the rights and duties of Highridge and LICMA are limited to those set forth in the contract between them. In the most recent contract, LICMA did not agree to purchase *any* amount of water from Highridge. (Trial court's opinion, p. 8.) Highridge could have negotiated to be LICMA's exclusive supplier, or it could have negotiated minimum purchase requirements, in order to ensure that the agreement remained a profitable venture. However, Highridge does not assert that the contract contains any provision which precludes LICMA from purchasing additional water from an alternate source.

Accordingly, we hold that the increase in volume of sales by Central to LICMA does not violate Section 4A(b)(2) of the Act because 1) such activity is not of the type specifically prohibited by the Act and 2) the rights of Highridge to sell water to LICMA are limited to those derived from the contract. The order of the trial court is affirmed.

### ORDER

NOW, February 20, 1997, the order of the Court of Common Pleas of Indiana County in the above-captioned matter is hereby affirmed.