## ALLEGHENY LUDLUM CORPORATION, Appellant,

v.

## MUNICIPAL AUTHORITY OF WESTMORELAND COUNTY, a public body.

Commonwealth Court of Pennsylvania.

Argued March 16, 1995.
Decided May 11, 1995.

---

Robert L. Byer, for appellant.

Dennis L. Veraldi, for appellee.

Before PELLEGRINI and NEWMAN, JJ., and SILVESTRI, Senior Judge.

PELLEGRINI, Judge.

Allegheny Ludlum Corporation (Allegheny Ludlum) appeals an order of the Court of Common Pleas of Allegheny County (trial court) denying its request for a declaratory judgment against the Municipal Authority of Westmoreland County (Authority) after the Authority increased its rates for the purchase of untreated water.

On May 10, 1950, Allegheny Ludlum entered into a contract with the Authority to purchase untreated water for its steel manufacturing plant in West Leechburg, Westmoreland County. The water was primarily to be used for cooling equipment and materials. The contract, which commenced on February 28, 1952, ran for twenty years with a twenty year extension. In 1958, the contract was amended to include the purchase of water by Allegheny Ludlum for its Bagdad plant in Armstrong County.[1] The rate that Allegheny Ludlum paid to the Authority for untreated water during the forty years that the contract was in effect was approximately $0.044 cents per thousand gallons of water.[2] On average, Allegheny Ludlum consumed 11 million gallons of water per day between the two plants. On February 28, 1992, the contract expired and the two parties attempted without success to negotiate rates for the purchase of water for another contract based on a reduction in consumption to approximately 6.5 million gallons of water per day.

Because the parties were unsuccessful in their negotiations, the Authority adopted the following rate scale effective April 1, 1992 for Allegheny Ludlum's purchase of untreated water based on a revenue requirement of $600,000:

| Price per Quarter | Allowance [3] |
|---|---|
| 36.83 cents/thousand | 720,000,000 gallons |
| 30.81 cents/thousand | 1,440,000,000 gallons |
| 24.69 cents/thousand | 2,160,000,000 gallons |
| 18.46 cents/thousand | Over 2,160,000,000 gallons |

Allegheny Ludlum filed a complaint with the trial court pursuant to Section 4 of the Municipality Authorities Act of 1945[4] alleging that the Authority had proposed rates that were unreasonable, arbitrary and bore no relationship to costs incurred by the Authority on behalf of Allegheny Ludlum and seeking a declaratory judgment. It also asked

---

1. Pursuant to the 1950 contract, the Authority constructed an impounding dam and reservoir on Beaver Run in Westmoreland County and constructed a transmission line from the Beaver Run Reservoir to Allegheny Ludlum's West Leechburg facility. By a subsequent amendment to the contract dated February 13, 1958, the Authority agreed to install and extend pipelines from its main line to Allegheny Ludlum's steel plant located in Armstrong County and referred to as the Bagdad plant. It also agreed to supply water to the Bagdad plant through the new pipelines pursuant to the original contract.

2. Pursuant to paragraph 3(b) of the agreement, Allegheny Ludlum agreed to be charged the following rates by the Authority:
 - First 720 million gallons per contract year $60.00 per million;
 - Next 720 million gallons per contract year $50.00 per million;
 - Next 720 million gallons per contract year $40.00 per million; and
 - Over 2,160 million gallons per contract year $30.00 per million.

3. It is not clear from the record whether Allegheny Ludlum was required to purchase 720,000,000 gallons in every quarter in order to receive the decreasing rates, or whether the figures under the Allowance of water only indicated the total amount of water that Allegheny Ludlum expected to purchase for a one-year period. However, using the Authority's figure for its revenue requirement of approximately $600,000, it had to determine its rates based on Allegheny Ludlum's consumption of over 2,160,000,000 gallons of water on an annual basis, not on a quarterly basis.

4. Act of May 2, 1945, P.L. 382, *as amended*, 53 P.S. § 306B(h).

the trial court to declare what was a reasonable rate for the service provided to it by the Authority.

Hearings were held on six different occasions.[5] Having the burden of proving that the Authority abused its discretion in the rate making process by assessing it an unreasonable rate,[6] Allegheny Ludlum first offered the expert testimony of Kalbarczyk, who was affiliated with Utility Rate Resources and was experienced in the areas of utility regulation and accounting. He testified that he performed a cost of service analysis to determine the Authority's revenue requirement and to see if the proposed rate was reasonable. He stated that based on his calculation, the Authority's proposed revenue requirement was not $600,000 as the Authority determined, but instead was $410,-493 based on various allocation factors[7] that he had considered.[8] He specified that he did not include costs for pumping because the water was gravity pulled or costs for purification because the water was untreated. He concluded that based on his allocation factors, $0.17 per thousand gallons was a reasonable rate for Allegheny Ludlum to pay for untreated water.

To support its rates, the Authority offered the testimony of Christopher H. Kerr (Kerr), the Resident Manager of the Authority, who developed the rates that Allegheny Ludlum was contesting. He stated the water rates for Allegheny Ludlum were based on a cost of $600,000 to provide service to Allegheny Ludlum, and the $600,000 figure was calculated based on historical expenses of the Authority including:

- labor costs
- treatment costs
- line repair costs
- cost of renovating intake building
- cost of cleaning screens at the intake
- costs associated with line inspection
- costs associated with daily water inspection
- costs associated with treatment of water going into primary reservoir
- costs associated with reading meter
- costs associated with calibrating meter
- costs associated with office and clerical help related to billing
- costs associated with any paperwork

Kerr also testified that a cost he considered in determining the $600,000 revenue requirement was the amount associated with Allegheny Ludlum's high volumes of water usage that left less water available to potable water users. Kerr stated that he did not know the exact costs associated with each of those expenses, with the exception of the cost of the line repair being $220,000 in one particular year, and the cost of the renovation of the intake building being $600,000 alone with 45% of that cost allocated to Allegheny Ludlum. However, he did state that while he had no documents reflecting mathematical calculations of those factors, he had performed calculations relying on items such as the Authority's budgets and general ledgers.

---

**5.** Prior to the date the hearings were scheduled to begin, Allegheny Ludlum filed a Motion in Limine to exclude expert testimony and an expert report prepared by Coopers & Lybrand, certified public accountants, submitted by the Authority. It contended that it would be severely prejudiced because the report was received three days before the hearings were scheduled to begin and none of the pre-trial briefs or memoranda mentioned either the report or the testimony as being evidence the Authority intended to present in its defense. As such, it would have inadequate time to prepare a response. The trial court determined that the expert testimony and report would be admissible for purposes of rebutting the testimony of Allegheny Ludlum's expert, Dennis M. Kalbarczyk (Kalbarczyk), but not for the purpose of supporting the rate making process that the Authority went through in determining its rate.

**6.** *See Vener v. The Municipal Sewer and Water Authority of Cranberry Township,* 5 Pa.Commonwealth Ct. 123, 289 A.2d 506 (1972).

**7.** An allocation factor is a ratio formula that attempts to correlate costs to factors that cause costs to increase or decrease.

**8.** Those factors were as follows:

| | |
|---|---|
| ● Operating expenses | $207,320 |
| ● Payroll expenses | 10,404 |
| ● Debt expenses | 101,747 |
| ● Depreciation expenses | 68,814 |
| ● Income from operations | 79,184 |
| ● Administrative expenses | 11,765 |
| ● Other income | (68,741) |
| TOTAL EXPENSES | $410,493 |

The Authority also offered into evidence a cost analysis report that had been prepared by Paul J. Cumiskey (Cumiskey) of Coopers & Lybrand, certified public accountants, that supported Kerr's determination that the Authority had a cost of service revenue requirement of $600,000 for Allegheny Ludlum. Cumiskey, an expert in the field of utility financial analysis rate setting and cost of service analyses, testified as to how those figures were calculated. He explained that those numbers were arrived at by determining the actual cost to the Authority for providing untreated water to Allegheny Ludlum. He further explained that the cost of service analysis was done to certify that the revenue requirement amount that the Authority used in establishing the rate was reasonable.[9] As a result of their study, Coopers & Lybrand calculated that the Authority had a $643,268 revenue requirement resulting in a rate to Allegheny Ludlum of $0.27[10] per thousand gallons of water based on an annual consumption of 2.4 billion gallons.[11]

Cumiskey also disputed Kalbarczyk's cost of service analysis because it showed an insufficient understanding of the Authority's business to develop allocation factors and much of his analysis was irrelevant to the case at hand.[12] He also testified that Kalbarczyk's study did not allocate costs for service to Allegheny Ludlum attributable to its pumping and purification operation, even though those operations had costs attributable to Allegheny Ludlum within them.[13] He noted that Kalbarczyk should have specifically identified actual costs as he did rather than use allocation factors. He concluded that he did not think the revenue requirements that were computed by Kalbarczyk or the rate that was set were reasonable.

After the hearings, the trial court denied Allegheny Ludlum's declaratory judgment action. Finding the evidence and testimony presented by the Authority credible and specifically stating that it was not persuaded by Kalbarczyk's testimony because it was based on inaccurate and incomplete information necessary to perform a proper analysis, it determined that the Authority had established a reasonable rate for service to Allegheny Ludlum. This appeal by Allegheny Ludlum followed.

9. Cumiskey stated that in performing the cost of service analysis, he not only reviewed the Authority's financial statements and budgets, maps, pictures and videos of the Beaver Run reservoir and conducted numerous interviews with employees of the Authority, but also reviewed Kerr's deposition and the process Kerr used to determine the Authority's revenue requirement. Cumiskey specified that although Kerr did not perform a formal cost of service analysis, he considered all of the necessary factors.

10. While Coopers & Lybrand came up with a cost of $0.27 and the Authority used a cost of $0.37, $0.27 was the average cost of purchasing water based on the price schedule the Authority provided to Allegheny Ludlum.

11. Coopers & Lybrand calculated the Authority's revenue requirement at $643,268 based on the following costs:

Operating Expenses:

| | |
|---|---|
| Source of Supply | $143,110 |
| Purification System | $11,810 |
| Pumping System | 8,890 |
| Distribution System | 34,104 |
| Commercial & General | 92,476 |
| Payroll Taxes | 14,671 |
| Depreciation | 86,839 |
| Other Income | 9,650 |
| Rate of Return | 241,718 |
| TOTAL | $643,268 |

Notably, even though the Authority arrived at a rate of $0.37 and the Coopers & Lybrand report resulted in a rate of $0.27, Coopers & Lybrand's figure was an average.

12. Cumiskey testified:

Well, he developed approximately 25 allocation factors and I think five of them were used to allocate costs between raw water and potable water. All the other—the other 20 or so allocation factors all related, with one minor exception, to the allocation of costs to the potable water customers. The one exception was related to allocating customer costs. And his use of those other 20 some allocation factors only resulted in $35.00 or so being allocated. Allegheny Ludlum's purported need of reading meters, preparing bills, collecting funds, monitoring the contracts, all of which is done on a month basis, seemed unreasonable to me. (Notes of Testimony at 483a–484a.)

13. Cumiskey testified that based on interviews he conducted with department heads that were responsible for those areas, he determined that some of the employees assigned to those departments were actually working on things related to the reservoir or to the transmission line. (Notes of Testimony at 540a.)

## I.

Section 4 of the Municipality Authorities Act of 1945 provides in pertinent part the following:

> Every Authority is hereby granted, and shall have and may exercise all powers necessary or convenient for the carrying out of the aforesaid purposes, including but without limiting the generality of the foregoing, the following rights and powers:
>
> \* \* \* \* \* \*
>
> (h) To fix, alter, charge and collect rates and other charges in the area served by its facilities *at reasonable and uniform rates* to be determined exclusively by it, *for the purpose of providing for the payment of the expenses of the Authority,* the construction, improvement, repair, maintenance and operation of its facilities and properties ... (Emphasis added.)

That section further provides that any person questioning the reasonableness of any rate fixed by an Authority may bring suit against the Authority in the court of common pleas, and that court shall have exclusive jurisdiction to determine all questions involving rates.

■ In deciding whether a rate is reasonable, the trial court's scope of review is limited to determining whether there has been a manifest and flagrant abuse of discretion or an arbitrary establishment of the rate system. *Township of Hopewell v. Municipal Water Authority of the Borough of Aliquippa,* 82 Pa.Commonwealth Ct. 134, 475 A.2d 878 (1984). The party challenging the validity of the rate has the burden of proving that it is unreasonable. *Vener.* Whether a rate is reasonable is dependent upon whether it is reasonably proportional to the value of the service rendered. *Township of Kennedy v. Ohio Valley General Hospital,* 129 Pa.Commonwealth Ct. 494, 566 A.2d 348 (1989), *petition for allowance of appeal denied,* 525 Pa. 661, 582 A.2d 326 (1990). "That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; judicial discretion may not be substituted for administrative discretion." *Patton–Ferguson Joint Authority v. Hawbaker,* 14 Pa.Common-

wealth Ct. 402, 406, 322 A.2d 783, 785–786 (1974).

■ Our scope of review of the trial court's decision involving Section 4B(h) of the Municipality Authorities Act of 1945 is limited to determining whether the factual findings are supported by substantial evidence and whether the law was properly applied to the facts. *Township of Raccoon v. Municipal Water Authority of the Borough of Aliquippa,* 142 Pa.Commonwealth Ct. 508, 597 A.2d 757 (1991), *petition for allowance of appeal denied,* 530 Pa. 636, 606 A.2d 904 (1992).

## II.

■ Allegheny Ludlum first contends that substantial evidence was not presented to support a finding that the Authority's rates were reasonable as required by Section 4 of the Municipality Authorities Act of 1945. Specifically, it argues that even though the trial court was not persuaded by its expert and found the Authority's witnesses more competent, the testimony of Kerr and Cumiskey was either incompetent or improperly admitted, and the trial court erroneously relied on their testimony to determine that the Authority's rate was reasonable.

Regarding Kerr's testimony, Allegheny Ludlum argues it was incompetent and did not provide substantial evidence to support the proposed rate because he did not provide any calculations to support the Authority's expected revenue requirement and proposed rate. It directs our attention to this court's holding in *Port Authority of Allegheny County v. Scott,* 62 Pa.Commonwealth Ct. 631, 643, 437 A.2d 502, 508, 509 (1981) where we stated, "[I]t is fundamental that the record or decision must reveal the analytical process or computation which supports the final rate determination.... [T]he appellate court must be furnished with the data used and the mathematical calculations adopted, not only in establishing the rate base, but also in preparing the resulting rate schedule itself." Allegheny Ludlum contends that because Kerr did not provide any calculations to support his $600,000 revenue requirement and proposed rate structure, his testimony

does not reveal the analytical process or computation required.

We agree that Kerr's testimony alone would be insufficient to support a finding that the proposed rate schedule was reasonable. While he testified that he considered twelve factors, Kerr only provided costs for two when determining the revenue requirement—$220,000 for the cost of the line repair and $270,000 for the cost of renovating the intake building. Because he did not provide calculations for each expense or a majority of the expenses determined to be factors in calculating that rate schedule, and *Scott* requires that the analytical process or computation which supports the final rate determination be provided by the Authority, Kerr's testimony in and of itself would not be sufficient to support a finding that the proposed rate schedule was reasonable.

### III.

However, Kerr's testimony was not the only evidence presented regarding the rate schedule. The Authority also submitted into evidence a cost of service analysis performed by Coopers & Lybrand to support its revenue requirement calculation that specifically itemized all of the expenses, explained the basis for those calculations and resulted in a revenue requirement close to that which the Authority had determined. Nonetheless, Allegheny Ludlum argues that the Coopers & Lybrand cost of service analysis did not constitute substantial evidence because it, too, was either incompetent or inadmissible.

Allegheny Ludlum challenges the admissibility of that report because:

- it was prepared long after the rates were set;
- it relies on information not obtainable during discovery; and
- the testimony of the expert's report was outside the scope of the report.

It also attacks the competency of the report because:

- the methodology used was appropriate for a private utility, not a public authority; i.e., it relied on the "utility" approach to determine costs rather than the "cash-needs" approach; and

- the approach was different than that of the Authority when it made the rate calculations.

### A.

Addressing Allegheny Ludlum's first challenge, it essentially is arguing that because the Coopers & Lybrand report was not prepared until well after the rate schedule was set, the Authority could not rely on that report to substantiate its rate. Initially, we should point out that although prudent, no study must be prepared in order to raise or set rates. While this is a large water authority, most are small and rates and rate schedules are based on the experience of the authority management and general cost knowledge, not with the exactitude used in formal rate studies. Almost all are never challenged.

Once rates are challenged and litigation ensues, that general knowledge and experience needs to be offered in a more formalized way. Until Allegheny Ludlum contested the proposed rate, the Coopers & Lybrand report was not needed. It was only after Allegheny Ludlum, who had the burden of proving the unreasonableness of the rate schedule, contested the rates that the necessity of "proving" the rate schedule arose. Nothing precludes the Authority from using evidence, including after-acquired outside experts, to substantiate a rate schedule.

### B.

Allegheny Ludlum also argues that the Coopers & Lybrand report was inadmissible because it was based upon information that the Authority claimed was unavailable in response to Allegheny Ludlum's discovery requests. It relies on Pa.R.C.P. No. 4019(a) which provides that the trial court may, on a motion, enter an appropriate order sanctioning a party if he fails to serve sufficient answers or objections to written interrogatories. It then cites *Davis v. Langton*, 301 Pa.Superior Ct. 338, 447 A.2d 996 (1982), for the proposition that trial courts have applied this rule to exclude information that was requested by a party but not provided to them during discovery. However, Kerr tes-

tified that Allegheny Ludlum was permitted to inspect and copy all of the documentary information made available to Coopers & Lybrand, and it chose to only copy some of the documentation. Because that testimony was uncontradicted, the trial court properly determined that the Authority had not withheld information from Allegheny Ludlum upon which the Coopers & Lybrand report was based, and the report was admissible.

■ Allegheny Ludlum also contends that the trial court improperly allowed Cumiskey to testify because it was only provided with a copy of his report three days before the hearings began. To support its contention, it relies on *Linker v. Churnetski Transportation, Inc.*, 360 Pa.Superior Ct. 366, 520 A.2d 502, *petition for allowance of appeal denied*, 516 Pa. 641, 533 A.2d 713 (1987), for the proposition that trials are no longer supposed to be fraught with surprise tactics launched against unsuspecting adversaries, and the purpose of discovery rules is to prevent surprise and unfairness and allow a fair trial to be held on the merits. We can find no unfairness and surprise here.

Even though Allegheny Ludlum may have received the Coopers & Lybrand report only three days prior to the start of the hearings, when arguing its motion in limine to exclude Cumiskey's report and testimony, counsel for Allegheny Ludlum admitted that because three and one-half months had passed from the time it received the report to the date of the hearing when Cumiskey's testimony began, the time the report was received was *not* a factor and it was not prejudiced. As such, because Allegheny Ludlum admitted that it was not prejudiced by the late filing of Coopers & Lybrand report, the trial court did not err by allowing that report to be admitted into evidence.

## C.

■ Regarding Cumiskey's testimony, Allegheny Ludlum contends that the trial court erred by allowing his testimony into evidence about the process followed by the Authority in arriving at its rate schedule because it went beyond the scope of his report. It points out that Pa.R.C.P. No. 4003.5(c) provides that an expert's direct testimony at the trial may not be inconsistent with or go beyond the fair scope of his testimony in his report. It then argues that while Cumiskey's report analyzed the cost of service of providing Allegheny Ludlum with water, it did not discuss the Authority's process of choosing the proposed rate schedule, and, therefore, his testimony to that effect went beyond the scope of his report and was inadmissible.

■ There is no dispute that Cumiskey's report did not analyze the Authority's method for setting a rate. However, Cumiskey's testimony regarding the methodology by which the Authority set its rate was in rebuttal to Allegheny Ludlum's attack on the reasonableness of the process. An expert's opinion in response to testimony need not be addressed in the expert's report. *Earlin v. Cravetz*, 264 Pa.Superior Ct. 294, 399 A.2d 783 (1979). Allegheny Ludlum was the party that raised the issue of the Authority's rate making process, and it cannot now complain that it was prejudiced by Cumiskey's response on that subject even though it was not contained within his report.[14] As such, the trial court did not err by allowing his testimony regarding the Authority's methodology into evidence.

## D.

■ Regarding the challenge to the methodology used in the Coopers & Lybrand

---

**14.** To determine whether an expert's testimony goes beyond the scope of his report, the trial court must decide "whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pretrial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response." *Wilkes–Barre Iron & Wire Works, Inc. v. Pargas, Inc.*, 348 Pa.Superior Ct. 285, 290, 502 A.2d 210, 213 (1985). The trial court, however, has wide discretion in deciding whether to allow the admission of expert testimony into evidence, and is not subject to reversal unless there has been a clear abuse of discretion. *Greer v. Bryant*, 423 Pa.Superior Ct. 608, 621 A.2d 999 (1993). Only when the admission of the testimony is harmful or prejudicial to the party complaining will there be reversible error. *Hart v. W.H. Stewart, Inc.*, 523 Pa. 13, 564 A.2d 1250 (1989). Here, the trial court properly determined that Allegheny Ludlum was not prejudiced by Cumiskey's testimony.

report, Allegheny Ludlum argues that the cash-needs approach should have been used, and it was inappropriate to use the "utility" approach because that method was appropriate for an investor-owned company, not a public authority such as the Authority. Moreover, if the approach is competent, it then contends that it was used improperly because a rate of return was used that was more appropriate for an investor-owned utility rather than a public one.

The American Water Works Association explains in its AWWA manual M1 [15] the difference between the "cash-needs" approach and the "utility" approach. The "cash-needs" approach, which is generally used by government-owned utilities, is one where the revenues of the utility must be sufficient to cover all cash needs, including debt obligations as they come due, for the period over which the rates are intended to be adequate. Factors that are considered in determining a revenue requirement include O & M expenses, debt service, and capital expenditures not debt-financed. Both Kalbarczyk and Kerr used that approach. The "utility" approach to determining revenue requirements is mandated for all investor-owned water utilities and for most government-owned municipal systems under the jurisdiction of state commissions or other regulatory bodies. It generally results in more stable rates that are not immediately affected by the level of system capital expenditures as are rates developed under the cash-needs approach. Factors that are considered in determining revenue requirements under this methodology include O & M expenses, depreciation, rates of return and taxes. (See pgs. 1164a–1166a of Reproduced Record.)

Cumiskey explained why he used the utility approach stating the following:

[T]he utility approach resembles more of accounting principle [sic] private sector company like Allegheny Ludlum would follow. It also tends to take out some of the one year exceptions that would occur. For example, in the capital expenditures, in one particular year there may be a lot of ex-

penditures for the raw water, the next year there would be very few. And if you happen to have a lot of raw water expenses, it could skew the results that you end up with. Using depreciation expenses tend to rely on the total amount of investment plan that have been acquired or purchased by the utility from the first day of operation, so it tends to have a little bit of averages or leveling effect.

(Notes of Testimony at 488a, 489a.)

Even though the Authority is not regulated by the state commission, there is nothing inherent when calculating water rates by an authority that it use that approach when a non-regulated authority challenges it in court to substantiate its rates as it would have to do before a commission. As the AWWA manual provides and Kalbarczyk agreed, both methods are recognized and acceptable methods of determining the actual costs of providing service.

 Nonetheless, Allegheny Ludlum also argues that even if the utility approach was proper, it used an inappropriate rate of return. It points out that based on a hypothetical in the AWWA manual M1, a rate of return for an investor-owned utility is 10.5% while the rate of return for the government owned utility is only 4.99%. Because Coopers & Lybrand used a rate of return of 8.9%, it contends that such a rate would have been more appropriate for an investor-owned utility rather than a government-owned utility like the Authority.

As Allegheny Ludlum itself points out, those rates of returns were hypothetical. While they may have been appropriate at the time the manual was written, there is no evidence that those rates, a function of the current prevailing interest rates, were appropriate at the time the Coopers & Lybrand study was performed. What Allegheny Ludlum appears to be saying is that public utilities' rates of return should be lower than that of an investor-owned utility, and the ratio of approximately 2–1 contained in the AWWA manual should be relied upon. Cumiskey

---

**15.** The manual, entitled "Water Rates", was published by the AWWA and copyrighted in 1991 as its fourth edition.

testified that the current allowable rate of return for an investor-owned utility was up to 14%, and the trial court found his testimony credible. While a rate of return of 8.9% is higher than the 2–1 ratio suggested by the AWWA, experts are not bound by suggestions contained in manuals as to how the rate can be formulated. In fact, experts may be more knowledgeable on subjects contained in manuals. It was within the discretion of the trial court to give Cumiskey's testimony the weight it desired, including full weight.

### E.

■ Allegheny Ludlum also argues that even if the utility approach was a proper methodology used by Coopers & Lybrand in calculating the Authority's rates, it was not the methodology used by the Authority when it calculated the rate schedule. However, there was no requirement that Coopers & Lybrand be bound by the same methodology used by the Authority. What was at issue was the proper rate. Because the end result was that Cumiskey was doing an analysis to determine the Authority's actual costs of providing water to Allegheny Ludlum, it was not erroneous for the trial court to allow the Coopers & Lybrand report into evidence as competent evidence even though it used a different methodology that used by the Authority.

■ Allegheny Ludlum also argues that even if it used the same methodology that the Authority used and arrived at the same rate schedule, the revenue generated would be $709,000 rather than $610,000 as the Authority calculated or $643,000 as Coopers & Lybrand had calculated. Initially, we should point out that the rate does not have to be exact, but only reasonably proportional. Here, the rate increase was either approximately $50,000 or $100,000 depending on whether the Authority's or Coopers and Lybrand's calculation of revenues was used. However, relying on a revenue figure of $643,000, as determined by the trial court to be reasonable, that revenue is based upon an assumption that Allegheny Ludlum will use a certain amount of water. Because that usage is dependent on whether Allegheny Ludlum's operations are at full capacity, there is

no guarantee that the Authority will receive its projected revenues or any revenue. As such, we do not believe that the difference between the Authority's revenue requirement and any increase is unreasonably excessive.

Moreover, based on Allegheny Ludlum's expected usage of 2.4 billion gallons of water per year, the cost to Allegheny Ludlum per thousand gallons of water per day would be $0.26—using a figure of $709,000, the cost to Allegheny Ludlum per thousand gallons of water per day would be $0.27, a minimal difference in what is already proposed by the Authority. Because our review of the costs provided by Kerr and Cumiskey support the trial court's finding that the revenue requirement was in the $600,000 range, we will not disturb the trial court's finding to that effect.

### IV.

■ Finally, Allegheny Ludlum argues that the trial court should have relied on its expert, Kalbarczyk, because he testified that the rate was not reasonable based on his calculation of the Authority's revenue requirement at $410,493 and a rate of $0.17 using allocation factors. However, the trial court was not persuaded by Kalbarczyk's testimony because it was "concerned that the information that was available to Mr. Kalbarczyk in his analysis was not the complete information that would have been necessary to do a proper analysis of the issues involved here." (Trial court opinion at p. 9.) Because it is within the province of the trial court when acting as fact finder to weigh conflicting testimony, determine credibility and resolve conflicts in the evidence, *D'Emilio v. Board of Supervisors, Township of Bensalem*, 157 Pa.Commonwealth Ct. 64, 628 A.2d 1230 (1993), Allegheny Ludlum's argument that the trial court should have relied on its expert instead of witnesses for the Authority is meritless.

Consequently, because the Coopers & Lybrand report was admissible and it supported the rate schedule that had been established by the Authority, there was substantial evidence to support the trial court's determination that the rate schedule estab-

lished was reasonable. Accordingly, the order of the trial court is affirmed.

## *ORDER*

AND NOW, this 11th day of May, 1995, the order of the Court of Common Pleas of Westmoreland County, No. 5851 of 1992, dated July 19, 1994, is affirmed.