# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| GSP Management Company, | : | |
| Appellant | : | |
| | : | |
| v. | : | No. 40 C.D. 2015 |
| | : | Argued: September 17, 2015 |
| Duncansville Municipal Authority | : | |

BEFORE: HONORABLE DAN PELLEGRINI, President Judge
HONORABLE RENÉE COHN JUBELIRER, Judge
HONORABLE P. KEVIN BROBSON, Judge

**OPINION BY JUDGE BROBSON**       **FILED: October 19, 2015**

By order of December 28, 2014, the Court of Common Pleas of Blair County (trial court) rejected the challenge of Appellant GSP Management Company (GSP) under Section 5607(d)(9) of the Municipality Authorities Act (Act), 53 Pa. C.S. § 5607(d)(9), to the sewage rate scheme of the Duncansville Municipal Authority (Authority). This section authorizes municipal authorities to establish "reasonable and uniform rates" for the services that they provide. Section 5607(d)(9) of the Act. The section also expressly authorizes suits against a municipality to challenge the reasonableness and uniformity of established rates. In its suit, GSP, by way of a declaratory judgment action, challenged the Authority's rate scheme both on its face (Count I) and as applied to GSP (Count II). (Reproduced Record (R.R.) 32a.) For the reasons set forth below, we affirm the trial court's rejection of the facial challenge, but we reverse the trial court's rejection of GSP's as applied challenge and remand the matter to the trial court for further proceedings.

The trial court resolved the parties' dispute in reliance on a Joint Stipulation of Facts (Stipulation). (R.R. 47a-53a.) According to the Stipulation, GSP operates a mobile home park in Allegheny Township, Blair County, known as Lehigh Terrace Mobile Home Park (Lehigh Terrace). The Authority does not provide water and sewer service directly to residents in Lehigh Terrace; rather, Lehigh Terrace maintains its own internal water distribution and sewage collection and conveyance systems. The Authority meters the water that it provides to Lehigh Terrace, but it does not meter the wastewater discharged from the mobile home park into the Authority's sewer system.

In June 2009, the Authority informed GSP of its adoption of a new "Sewer Rate Structure Based on Water Meter Readings – High End Users" (New Rate Structure). The New Rate Structure provides for the calculation of a sewer bill based on tiered sewer rates, where the rate increases on a sliding scale corresponding to the amount of metered water supplied to the customer. As the customer's metered water increases through particular bands, so too does the assessed sewer rate and, consequently, the customer's sewer bill. The Authority's New Rate Structure does not expressly provide for an allowance where a customer encounters extreme deviations in the amount of its sewer bills based on water leaks between the point where the water is metered and where water is accessed by the customer or, in the case of Lehigh Terrace, the resident. There is no dispute that metered water orphaned by a leak in the internal Lehigh Terrace system is consequently not used by Lehigh Terrace residents and thus is never discharged into the Authority's sewer system. Since implementation of the New Rate Structure, the Authority has historically billed Lehigh Terrace for approximately 40,000 gallons of water a month and, consequently, approximately 40,000 gallons

2

of sewage a month. Lehigh Terrace's highest metered water flow during a month in which it did not experience any leaks in its internal water distribution system was approximately 60,000 gallons.

Lehigh Terrace experienced significant leaks in its internal water distribution system on several occasions during 2009 and 2011. In June and July 2009, as a result of the leaks, metered water flow into Lehigh Terrace increased to 130,000 gallons and 220,000 gallons, respectively. In March 2011, again due to leaks, the metered flow into Lehigh Terrace was 110,000 gallons. Lehigh Terrace experienced leaks again in August, September, October, and November of 2011, with corresponding metered flow into the property of 120,000; 330,000; 580,000; and 210,000 gallons, respectively. During each of these months, despite the increase in metered water flowing into Lehigh Terrace, there was no corresponding increase in outflow of sewage from Lehigh Terrace into the Authority's sewage system. In other words, water consumption by Lehigh Terrace residents stayed relatively stable, as did their discharged waste water; the excess metered water was attributable to the leaks, lost somewhere in the conveyance of the water from the meter point to the residents due to leaks in the Lehigh Terrace distribution system. Once Lehigh Terrace repaired the leaks, metered flow returned to its historic average (approximately 40,000 gallons a month).

The Authority has an unwritten policy of making allowances for those that have experienced uniquely high water and sewer bills, but only where a malfunction in the customer's water meter is established. In such cases, the bills will be adjusted. Where, however, the high water and sewer bills are the result of leaks after the point of the meter and within the customer's property, the Authority will permit an installment payment plan, but it will not adjust the sewage bill.

3

Under the Rate Structure, and using Lehigh Terrace's average monthly water consumption *with no leaks* of 40,000 gallons, Lehigh Terrace's monthly sewer bill would be $753.00. The monthly sewer bill based on 60,000 gallons of metered water, Lehigh Terrace's highest during a no leak month, would be $1,253.00. During the months where Lehigh Terrace's metered water spiked due to leaks in its internal distribution system, the Authority billed Lehigh Terrace the following amounts for sewer service:

| | |
|---|---|
| June 2009 | $3,003.00 |
| July 2009 | $5,253.00 |
| March 2011 | $2,503.00 |
| August 2011 | $2,753.00 |
| September 2011 | $8,003.00 |
| October 2011 | $14,253.00 |
| November 2011 | $5,003.00 |

In the Stipulation, the Authority agrees with GSP that for these months, the sewer bills for Lehigh Terrace "were not reasonably proportional to the value of the sewer service rendered by the Authority." (R.R. 52a.)

GSP has paid its water bills from the Authority in full. They are not at issue in this case. GSP has also paid its sewer bills from the Authority in full for every month other than the seven months at issue here. For those months, GSP has remitted to the Authority $11,781.00 to be applied toward its sewer bills for those months. Ultimately, GSP's declaratory judgment action, challenging the New Rate System on its face and as applied, is about obtaining relief from the sewer bills assessed by the Authority for the seven months where it is undisputed that due to leaks in Lehigh Terrace's internal water conveyance system, substantially more

4

metered water flowed into Lehigh Terrace than waste water discharged from Lehigh Terrace into the Authority's sewer system.

Following the filing of the declaratory judgment action, the Authority filed a lien against GSP's principal for the amount of the unpaid sewer bills. The parties filed a joint motion to consolidate the Authority's lien with GSP's declaratory judgment action. In that joint motion, the Authority and GSP represented to the Court that "GSP's argument in support of its declaratory judgment action is the same as its defense against the Authority's . . . lien—that the Authority's sewer rate structure is not reasonable and, therefore, violates Section [560]7(d)(9) of the [Act]." (R.R. 25a.) It appears that, through their joint motion to consolidate, the parties dispensed with the formalities of a writ of scire facias by the Authority, seeking collection of the lien amount, and an affidavit of defense from GSP, opposing collection in whole or in part.[1] The trial court granted

---

[1] Scire facias is a "judicial writ, founded upon some matter of record, such as a judgment or recognizance and requiring the person against whom it is brought to show cause why the party bringing it should not have advantage of such record." The Latin term is used to designate both the writ and the whole proceeding. Black's Law Dictionary 1346 (6th ed. 1990). "The object of the writ of scire facias is ordinarily to ascertain the sum due on a lien of record and to give the defendant an opportunity to show cause why the plaintiff should not have execution." *Western Clinton Cty. Mun. Auth. v. Estate of Rosamilia*, 826 A.2d 52, 56 (Pa. Cmwlth. 2003) (*Estate of Rosamilia*). In *Estate of Rosamilia*, we outlined the ordinary process, as provided in what is commonly referred to as the Pennsylvania Municipal Claims and Tax Liens Act (MCTLA), Act of May 16, 1923, P.L. 207, *as amended*, 53 P.S. §§ 7101-7505:

> In Pennsylvania, municipal claim procedure in general and scire facias procedure in particular, is purely statutory. Once the municipality files a claim for services, the claim becomes a lien on the property. If the owner does not dispute the claim and assessment, the owner simply pays and removes the lien. To contest the claim or amount of assessment and to force the issue to an original hearing, the owner may file and serve a notice upon the

**(Footnote continued on next page…)**

5

the motion and consolidated the lien action with GSP's declaratory judgment action.

Based upon the stipulation of facts, briefs, and oral argument of the parties, the trial court concluded that (1) the Authority's New Rate Structure is facially valid, and (2) GSP failed to demonstrate that the imposition of the New Rate Structure on GSP during the seven months it experienced water leaks in its water system constituted an abuse of discretion or an arbitrary establishment of the rate system. Accordingly, the trial court refused to adjust GSP's sewer bills during the seven months in question. (R.R. 124a.) GSP challenges the trial court's legal conclusions on appeal.

As noted above, Section 5607(d)(9) of the Act provides authorities with the power

> [t]o fix, alter, charge and collect rates and other charges in the area serviced by its facilities at reasonable and uniform rates to be determined exclusively by it for the purpose of providing for the payment of expenses of the

---

**(continued…)**

> claimant municipality to issue a writ of scire facias. In the proceeding commenced by the writ of scire facias, the owner then files an "affidavit of defense." In that affidavit the owner may raise all defenses he or she has to the municipal claim.
>
> Alternatively, the municipality may pursue a writ of scire facias without waiting for prompting by the owner, which is what occurred in the present case. In response to the writ, the owner may file an affidavit of defense raising all defenses.
>
> . . . [T]he existence of a local administrative procedure for contesting sewer bills does not alter the statewide statutory scheme for municipal claims and writs of scire facias.

*Estate of Rosamilia*, 826 A.2d at 56 (citations omitted).

authority . . . and operation of its facilities . . . . Any person questioning the reasonableness or uniformity of a rate fixed by an authority . . . may bring suit against the authority.

In *Allegheny Ludlum Corporation v. Municipal Authority of Westmoreland County*, 659 A.2d 20 (Pa. Cmwlth. 2006), we held that

[i]n deciding whether a rate is reasonable, the trial court's scope of review is limited to determining whether there has been a manifest and flagrant abuse of discretion or an arbitrary establishment of the rate system . . . . The party challenging the validity of the rate has the burden of proving that it is unreasonable . . . . Whether a rate is unreasonable is dependent upon whether it is reasonably proportional to the value of the service rendered . . . . Judicial discretion may not be substituted for administrative discretion.

*Allegheny Ludlum*, 659 A.2d at 26 (citations omitted). The challenger bears the burden of proving that the water and/or sewer rate system is unreasonable. *Ridgway Twp. Mun. Auth. v. Exotic Metals, Inc.*, 491 A.2d 311, 313 (Pa. Cmwlth. 1984). In addressing rate claims under the Act, courts must consider the value of the challenged service *as well as its use*. *Id*. This Court has held, however, that there is value in simply being connected to a sewer system. *Washington Realty Co. v. Municipality of Bethel Park*, 937 A.2d 1146, 1150 (Pa. Cmwlth. 2007), *appeal denied*, 960 A.2d 457 (Pa. 2008). In *Scott Township Sewer and Water Authority v. Ease Simulation, Inc.*, 2 A.3d 1288 (Pa. Cmwlth. 2010), the Court held that the fact that the user paid more for service than a neighbor did not make the rate *per se* unreasonable. *Scott Twp.*, 2 A.3d at 1291. In *Ack v. Carroll Township Authority*, 661 A.2d 514 (Pa. Cmwlth. 1995), *appeal denied*, 673 A.2d 336 (Pa. 1996), we commented that "rates need not be proportioned with exactness to [the] use made or the cost to the individual customer, so long as it is reasonably related to the cost of maintaining the service for all customers, and the customers

7

challenging the rates receive 'some' benefit from the system." *Ack*, 661 A.2d at 518. The charge should be reasonably proportional to the value of the service, rather than to the use made of the system. *In re Petition of City of Philadelphia*, 16 A.2d 32, 35 (Pa. 1940).

With regard to GSP's facial challenge to the New Rate Structure, appellate courts have concluded that basing sewer rates upon the amount of metered water flowing into a property is a valid means of establishing rates for sewer system services. *In re City of Philadelphia*, 21 A.2d 876, 878 (Pa. 1941); *Borough of North East v. A Piece of Land Fronting on West Side of South Lake Street*, 159 A.2d 528, 530-31 (Pa. Super. 1960) (en banc). Consistent with this precedent, we conclude similarly that the Authority's New Rate Structure is not invalid on its face and affirm the trial court's decision in this regard.

We now turn our attention to GSP's as applied challenge. GSP contends that the New Rate Structure, as applied to the circumstances established in the parties' Stipulation, is unreasonable. Whether and, if so, under what circumstances, a person can bring a reasonableness challenge under Section 5607(d)(9) of the Act on an as applied basis appears to be an issue of first impression for this Court. There is, however, informative precedent from the Pennsylvania Superior Court on the subject, which predates this Court's creation and assumption of appellate jurisdiction over these types of local government matters.

In *Municipal Authority of the Town of Bloomsburg v. Bloomsburg Cooperative Canners, Inc.*, 199 A.2d 502 (Pa. Super. 1964) (en banc) (*Bloomsburg*), a local cannery challenged the reasonableness and uniformity of how the municipal authority fixed the sewer rental fee that it would charge the

8

cannery with respect to its industrial operations. Apparently, although not clear from the Superior Court's opinion, rather than establish a general rate structure applicable to all users, the municipal authority established separate rental rates for each industrial user. In this regard, the local cannery's challenge in *Bloomsburg* had attributes of both a facial and as applied challenge to the municipal authority's rate decision. One of the challenged components of the rental rate assessed against the cannery involved a basic charge, calculated as a percentage, initially 85% and increased to 95% in 1960, applied to all metered water entering the plan. Another challenged component was a surcharge of 100%, decreased in 1960 to 65%, of the basic charge on account of certain industrial material that the authority's plant had difficulty disposing of. The common pleas court granted the cannery relief with respect to its challenge to the base rate and reduced the base rate percentage from 85%, and later 95%, of metered water to 65% of metered water. The municipal authority appealed.

In evaluating the merits of the municipal authority's appeal, the Superior Court first noted that in 1960, the municipal authority increased the basic rate percentage from 85% to 95% but decreased the surcharge from 100% to 65%. It then observed:

> In the absence of a showing of *special circumstances*, such as the fact that a substantial part of the metered water entering the plant did not reach the sewage system or that a substantial amount of unmetered water was entering the system, a percentage of the metered water consumption as determined by the authority is a proper basis for sewer rates.

*Bloomsburg*, 199 A.2d at 504 (emphasis added). Applying this principle to the evidence in the case, the Superior Court held that the trial court did not abuse its discretion in reducing the basic charge rate to 65% of metered water:

9

At the time of the increase of the base rate the authority had in its possession cannery figures showing that more than 27% of water consumption did not reach the sewer line. On this evidence, a holding that a basic charge premised on 95% of water consumption is unjustified is a proper exercise of the discretion of the court below. If believed, the testimony would warrant a reduction to at least 73% of metered water consumption, and, in view of the evidence that charges to other industrial patrons were based upon less than 50% of metered water consumption, we find no abuse of discretion in its conclusion that the basis on which the cannery was charged was discriminatory. We, therefore, cannot say that the court was unwarranted in determining that 65% of water consumption was a proper figure upon which to calculate the basic charge. While there was evidence that the cannery used some unmetered well water, some of which then entered the sewage system, there was also evidence that other industrial users did likewise. There is no indication that the court did not take this into consideration in concluding that under the circumstances the proper figure should not be higher than 65%.

*Id.*

To summarize, in *Bloomsburg*, the Superior Court held that the common pleas court was justified in holding unreasonable a basic charge premised on 95% of water consumption when the municipal authority knew that up to 27% of all metered water entering the cannery never reached the authority's sewer lines. This alone would have warranted a reduction to at least 73% (100% of metered water less the 27% orphaned water that never reached the authority's sewer lines). But there was another reason to reduce the percentage even further—*i.e.*, the 95% figure was discriminatory based on evidence that showed that the sewer charges of other industrial users were based on less than 50% of metered water. Based on this

additional reason, a further reduction to 65% of metered water consumption was justified.[2]

In *Borough of North East*, the Superior Court addressed a manufacturing company's challenge to a borough's sewer rates based on non-use. The company purchased water from the borough for the purpose of its industrial manufacturing operation. The borough, however, only authorized the company to discharge into the municipality's sewer system 5% of the water purchased. Nonetheless, the borough fixed its sewer rental charge for all users at 20% of its water charge. The company refused to pay, contending that a rate based on 20% of the amount of water purchased to treat only 5% of the water it purchased was unreasonable. The municipality commenced collection actions through enforcement of a municipal lien for the unpaid amount. Siding with the company, the common pleas court entered a judgment in favor of the municipality, but for substantially less than the amounts billed. The municipality appealed.

The Superior Court affirmed, rejecting the municipality's position that use of the system is an irrelevant factor when evaluating the reasonableness of a sewer rate:

> If the borough's contentions were correct—that regardless of the amount of the proven use of the borough system a consumer must pay 20 per cent of its total water bill as sewer rental—the charge would be in the nature of a tax rather than a payment for the service rendered. Sewer rentals are not taxes.

---

[2] The trial court rejected GSP's reliance on *Bloomsburg* because the Superior Court based its decision to reduce the basis charge, in part, on the ground that it was discriminatory and GSP does not raise such a challenge in this case. At most, however, this distinction makes that aspect of the reasoning in *Bloomsburg* inapplicable to our resolution of GSP's appeal.

*Id*. at 531-32. Further, the Superior Court indicated that the use of a rate based on water consumption that disregarded the ultimate use (and disposition) of the water consumed, would be "arbitrary, improper, inequitable and unlawful." *Id.* Moreover, in rejecting a contention by the Borough that the company's challenge to its rate ordinance was untimely, the Superior Court observed that the company was not attacking the sewer rate ordinance "per se" but rather questioned "the method of application of the ordinance in the calculation of the annual sewer charge." *Id.* at 533. Although the company may not have timely challenged the ordinance, its challenges to its annual sewer bills were timely. *Id.*

We find the Superior Court's decisions in *North East* and *Bloomsburg* persuasive to the extent that they stand for the proposition that where a municipal authority adopts a sewer rate structure that is tied to the amount of metered water flowing into a property, a sewer customer may challenge the amount of its sewer bills by establishing that a substantial part of the metered water entering the property did not reach the sewage system. The Authority's view is that under such a rating structure, the customer bears all risk that a portion of the metered water will not flow through to the municipal sewer system. Even though the orphaned water would have no impact on and present no burden to the capacity of the municipal sewer system, the Authority contends that the customer must nevertheless pay for sewer services based upon the amount of metered water. We disagree and, consistent with the reasoning of the Superior Court in *North East* and *Bloomsburg*, hold that where there is an extraordinary water loss between the point of metering and the point of discharge into the municipal sewer system that is substantial in quantity and unplanned or unanticipated, relief from the sewer charges during those periods of extraordinary water loss would be warranted to

12

ensure that the amount billed and collected is not unreasonable in relation to the service rendered, crossing the line between a permitted fee and an unauthorized tax.

Based on the parties' Stipulation, it is undisputed that during the seven months at issue, Lehigh Terrace experienced a loss of water between the metering point and the point of discharge into the Authority's sewer system. The loss was extraordinary, because the parties attribute the loss to leaks in Lehigh Terrace's internal water distribution system during those months and not some other ordinary explanation for a spike in metered water usage—*e.g.*, filling a swimming pool or watering a large lawn.[3] The loss of water due to the leaks was substantial in amount. The Stipulation provides that, on average, Lehigh Terrace consumed approximately 40,000 gallons of metered water per month—60,000 gallons at its highest. During the months where Lehigh Terrace experienced leaks in its internal system, metered flow into Lehigh Terrace ranged from a low of 110,000 gallons to a high of 580,000 gallons. Taking Lehigh Terrace's highest month of normal water usage (60,000 gallons) as the point of comparison, during the months at issue metered flow into Lehigh Terrace doubled at its lowest point (March 2011) and increased nearly ten-fold at its highest point (October 2011). There is nothing in the Stipulation to support any finding that the leaks were planned or anticipated. Moreover, the parties agree that the significant, unplanned, and unanticipated increase in metered water flowing into Lehigh Terrace imposed no increased burden on the Authority's sewer system. Under these circumstances, relief from

---

[3] We note here, again, that GSP has paid in full the water bills from the Authority during these seven months and that the only issue before is us the amount to be paid on the sewer bills.

13

the amounts the Authority billed GSP during these months for sewer service is appropriate.

Given the circumstances of this case, we need not resolve the question of whether GSP's "as applied" challenge to the Authority's New Rate Structure under Section 5607(d)(9) of the Act by way of a declaratory judgment action was an appropriate mechanism to decide the parties' dispute over the amount billed by the Authority for sewer service. Here, the parties and the trial court consolidated the Authority's lien, treating it as a scire facias proceeding. In such a proceeding, as we observed in *Estate of Rosamilia*, GSP was entitled to challenge the reasonableness of the amount billed by the Authority. *See also Ridgway Twp. Mun. Auth.*, 491 A.2d at 313 (holding trial court did not err in finding minimum monthly water rate, as applied, was unreasonable when compared to actual use and reducing amount of bill). The scire facias proceeding affords GSP relief in this situation.

Accordingly, although the trial court appropriately rejected GSP's facial challenge to the Authority's New Rate Structure, we conclude that the trial court erred in refusing to adjust GSP's sewer bills during the seven months in question. We remand the matter to the trial court to determine the amount that GSP should pay to the Authority for those seven months.

P. KEVIN BROBSON, Judge

14

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

GSP Management Company, : 
                   Appellant : 
                       : 
          v. :   No. 40 C.D. 2015 
                       : 
Duncansville Municipal Authority : 

## O R D E R

AND NOW, this 19th day of October, 2015, the order of the Court of Common Pleas of Blair County (trial court) is AFFIRMED in part and REVERSED in part, and the matter is REMANDED to the trial court for further proceedings consistent with the accompanying opinion.

      Jurisdiction relinquished.

_____
P. KEVIN BROBSON, Judge
